Eric S. Berelovich
U.S. SECURITIES AND EXCHANGE COMMISSION
Division of Enforcement
100 F Street, N.E.
Washington, DC 20549
*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,**<br><br>        **Plaintiff,**<br><br> **vs.**<br><br>**EVARIST C. AMAH,**<br><br>        **Defendant.** | **Case No.**<br><br>**Jury Trial Demanded** |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission (the "SEC"), for its Complaint against Defendant Evarist C. Amah ("Amah" or "Defendant"), alleges as follows:

## SUMMARY

1. From approximately April 2016 through July 2019, Amah, a New York-based investment adviser, engaged in a fraudulent scheme to raise approximately $698,000 from nine fellow members of his religion. In doing so, Amah repeatedly used materially false and misleading statements regarding his investment performance. In particular, Amah agreed to serve as the investment adviser to eight of these individuals in connection with two investment programs designed to both generate returns for his clients and provide financial support to their religion. Despite losing over 97% of his advisory clients' assets just over five months after starting to trade with their money, Amah repeatedly claimed that he had achieved modest returns

of between 3% and 5% and stated that he could increase the returns his strategy was able to generate if his clients invested additional assets.

2.      Amah engaged in additional deceptive conduct to perpetuate his fraudulent scheme. On at least two occasions, after he had lost over 97% of his clients' assets, Amah fabricated performance statements falsely showing that he had achieved modest returns or minimized losses.  While the actual account balance for his clients was, respectively, $4,907 and $1,859, Amah's fake performance statements reported that total assets were, respectively, $439,751 and $325,794.

3.      Amah also favored certain of his advisory clients over others in violation of the fiduciary duties he owed to all of his advisory clients.  Specifically, Amah invested his clients' money in a hedge fund he had created previously, Lumine Fund, LP ("Lumine Fund" or "Fund"). Amah did not, however, treat them as equal members of the Fund.  Amah commingled their assets and, without disclosing to the Fund's existing investors or its administrator what he was doing, deposited all of the investments in a single Fund sub-account in the name of ECA Capital Management, LLC ("ECA Capital").  ECA Capital was the Fund's managing member, and Amah had exclusive control of the sub-account, but the only assets in the sub-account belonged to his advisory clients.  Thus, when Amah paid Fund expenses from ECA Capital's sub-account, he was causing certain of his advisory clients to pay the expenses of his other client, the Fund.

4.      By engaging in this conduct, Amah violated and, unless restrained and enjoined, will again violate Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)]; Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and Sections 206(1), (2), and (4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-6(1), (2), and (4)] and

Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8]; and will again aid and abet violations of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

5.     By this Complaint, the SEC seeks injunctions, civil penalties, and such other and further relief as the Court considers just, equitable, and proper.

## JURISDICTION AND VENUE

6.     The SEC sues under Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)].

7.     This Court has jurisdiction over this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v], Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78u and 78aa]; and Sections 209 and 214 of the Advisers Act [15 U.S.C. §§ 80b-9 and 80b-14].

8.     Venue is proper in the Southern District of New York pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].  Certain of the transactions, acts, practices, and courses of business constituting the violations alleged herein occurred within the Southern District of New York and elsewhere, and were effected, directly or indirectly, by use of the means or instruments or instrumentalities of transportation or communication in interstate commerce, or of the mails, or the facilities of a national securities exchange.  As detailed below, among other things, Amah resides within this district and planned and provided the investment advisory services described in this Complaint from his home office in this district, including by using banks located in this district.

**DEFENDANT**

9.     **Evarist C. Amah**, age 54, was the majority owner and Chief Executive Officer of ECA Capital, and the only person who provided any services on its behalf.  At all relevant times, Amah was an "investment adviser" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)] because he was in the business of providing investment advice to clients about securities in exchange for compensation, and he also owned and exclusively managed and controlled ECA Capital.  He resided in, and operated ECA Capital from, New Rochelle, New York at all relevant times.  Amah has held a Chartered Accountant license in the United Kingdom since 2008.

**RELATED ENTITIES**

10.     **ECA Capital Management LLC** was a New York limited liability company that Amah formed in 2012 with its principal place of business in New Rochelle, New York.  At all relevant times, ECA Capital was an "investment adviser" within the meaning of Section 202(a)(11) of the Advisers Act.  ECA Capital was dissolved in June 2020.

11.     **Lumine Fund, LP** was a Delaware limited partnership Amah formed in November 2015 with its principal place of business in New Rochelle, New York.  Lumine Fund was a pooled investment vehicle within the meaning of Advisers Act Rule 206(4)-8 because it was engaged primarily in the business of investing, reinvesting, or trading in securities, and thus is an investment company, as defined in Section 3(a) of the Investment Company Act of 1940.  Amah and ECA Capital served as Lumine Fund's investment advisers, and ECA Capital was its general partner.  The Fund was dissolved in May 2020.

12.     **Mountain Support Initiative – Investment Trading ("MOSI-IT")** was offered to investors as a pooled investment vehicle, but in reality was an investment program Amah managed to benefit both his advisory clients and their shared religion.  Amah never formally

4

created MOSI-IT as a legal entity, operating it instead through ECA Capital's sub-account in Lumine Fund.

13.    **MOSI-IT Special Project ("Special Project")** was also offered to investors as a pooled investment vehicle, but in reality was a second investment program Amah managed to benefit both an advisory client and their shared religion.  Amah never formally created Special Project as a legal entity, operating it instead through his personal brokerage accounts.

FACTS

**I.    AMAH CREATED AMBIGUITY IN HIS RELATIONSHIPS WITH HIS ADVISORY CLIENTS**

14.    Amah created ambiguity in his relationships with the various individuals and entities he advised.  In general, Amah engaged in a bait-and-switch arrangement whereby he offered an investment in MOSI-IT as a pooled investment vehicle, but actually sold the fellow members of his religion interests in Lumine Fund, albeit without their knowledge.

15.    Moreover, Amah did not treat the MOSI-IT investors like full limited partners in Lumine Fund; he did not provide them with Lumine Fund offering documents, have them sign Limited Partnership Agreements, create sub-accounts in their names, or provide them with quarterly account statements.  In fact, he never even disclosed to the other limited partners or the Fund's administrator that the MOSI-IT investors became investors in the Fund.  Instead, Amah established an investment advisory relationship with each MOSI-IT investor, later memorializing this through each investor's Investment Management Agreement ("IMA") with ECA Capital, and managed their money through ECA Capital's sub-account in Lumine Fund.

16.    Accordingly, as a result of Amah's approach to organizing his advisory business, the MOSI-IT investors (henceforth "MOSI-IT advisory clients") were *both* quasi-limited partners in Lumine Fund and Amah's individual investment advisory clients, and MOSI-IT was nothing more than an investment program Amah managed through Lumine Fund.

5

17.     Amah also failed to observe typical formalities with respect to Special Project, which he managed on behalf of Investor 1 and Investor 1's nephew ("the Nephew") using his personal bank and brokerage accounts.  Amah served as an investment adviser to Investor 1 in his individual capacity, but did not have such a relationship with the Nephew.

## II.     AMAH ESTABLISHED LUMINE FUND AND SERVED AS ITS INVESTMENT ADVISER

18.     In January 2016, Amah sold limited partnership interests in Lumine Fund to two individuals and one entity (the "Limited Partners"), raising $265,000 from these investors. Several months later, Amah and his wife invested $32,000 of their own money in exchange for limited partnership interests held in their own names, becoming Limited Partners of the Fund.

19.     The interests Amah sold in Lumine Fund were securities because there was an investment of money in a common enterprise (the Fund) with a reasonable expectation of profits to be derived from the efforts of others (Amah's trading in financial assets).

20.     Before they invested, Amah emailed to each of the Limited Partners the Limited Partnership Agreement, Subscription Documents, and Private Placement Memorandum (together, the "offering documents").  The offering documents provided that ECA Capital, and thus Amah, would receive compensation for the investment advisory services it provided to the Fund.  In particular, each Limited Partner agreed to pay both a monthly management fee of 1% or 2% (annualized) of their account balance and a quarterly performance fee of 40% of their net capital appreciation.  Amah had exclusive control over the offering documents' content.

21.     Amah selected and communicated with the Fund's financial institutions and service providers, analyzed its investment options, controlled its assets with complete discretion, and invested them on the Fund's behalf.  Amah also communicated with the Fund's investors regarding the Fund's performance.

22.     Amah began trading the Fund's $265,000 on January 19, 2016.  By April 1, 2016, his trading losses reduced this capital to approximately $123,000, a negative return of over 50%.

23.     At all relevant times, Amah knew the approximate value of the Fund's total assets because he regularly accessed the Fund's accounts, provided monthly brokerage and bank statements to the fund administrator, and/or reviewed and approved the Fund's quarterly statements.

24.     Because they engaged in the business of advising others as to the value of securities or the advisability of investing in, purchasing, or selling securities in exchange for compensation, Amah and ECA Capital served as investment advisers to the Fund.  As such, they owed the Fund the fiduciary duties of care, loyalty, full and fair disclosure, and to act in good faith.

### III.    AMAH USED MATERIALLY FALSE AND MISLEADING STATEMENTS TO SOLICIT INVESTMENT IN THE MOSI-IT PROGRAM

25.     Amah is a member of a religious organization called the Grail Movement.  The Grail Movement has its origins in Vomperberg, Austria, where adherents have established a settlement ("the Mountain") that hosts festivals and other religious activities.

26.     On April 18, 2016, Amah and a fellow Grail Movement member, Investor 1, discussed an investment idea both to benefit the Mountain and generate returns for investors. The investment would be open to other Grail Movement members.

27.     In the following months, Investor 1, the Nephew, and Amah communicated by email and phone to plan the investment program, which they called "Mountain Support Initiative – Investment Trading" or "MOSI-IT".  At the time of these communications, Amah was in New Rochelle, New York, Investor 1 was in Nigeria or Italy, and the Nephew was in Dutchess County, New York.

28.     Amah was, however, the only one of the three individuals with training and professional experience in investing and accounting, and it was understood that he would serve as the investment adviser in connection with the investment program.  And he did so.

29.     Amah offered the MOSI-IT investment as an investment in a pooled investment vehicle and suggested generally, without naming Lumine Fund, that the MOSI-IT investments be traded through his "hedge fund."  Amah also drafted, reviewed, and/or edited MOSI-IT's offering documents and investor communications, designed the investment structure and other key details of the MOSI-IT offering, designed and implemented its investment strategy, prepared performance updates for investors, and had discretionary control over the investment assets.

30.     Amah did not, however, formally establish MOSI-IT as a legal entity.  Instead, as explained below, Amah pooled his MOSI-IT advisory clients' assets and deposited them into, and managed them through, ECA Capital's sub-account in Lumine Fund.  Approximately two months after doing so, Amah signed investment management agreements ("IMAs") on ECA Capital's behalf with each MOSI-IT advisory client stating that the "amount deposited shall be transferred to Lumine Fund and actively traded by the manager."  In essence, because MOSI-IT did not exist in any legal sense, Amah actually sold to his MOSI-IT advisory clients interests in Lumine Fund, which are securities for the reasons described above.  And in doing so, Amah and ECA Capital simultaneously served as investment advisers to the MOSI-IT advisory clients in their individual capacities and to the pooled investment vehicle, either MOSI-IT or Lumine Fund or some combination of the two.  As such, in addition to owing the pooled investment vehicle fiduciary duties, Amah and ECA Capital also owed each of the MOSI-IT advisory clients the fiduciary duties of care, loyalty, full and fair disclosure, and to act in good faith.

31.     More specifically, in a May 3, 2016 email, Amah suggested to Investor 1 and the Nephew that MOSI-IT investments be traded through his "hedge fund," suggested a $1 million initial investment, and projected "a first year return in excess of 100%" and annual returns of about $1 million for the Mountain by the third year.  Amah omitted from his predictions the extent of the losses he had already incurred through his trading for his hedge fund – Lumine Fund – which at that point were over 50% of the invested principal.

32.     Through these statements and omissions, Amah sought to convince Investor 1 and the Nephew to invest in his MOSI-IT program and to solicit others to do so as well.  Having already lost over 50% of the Fund's assets and omitting this material fact, Amah knew or was reckless in not knowing that his projections of MOSI-IT's future returns were materially false and misleading.

33.     From May 17 to July 28, 2016, Amah helped prepare MOSI-IT's offering documents – including a question and answer document ("Q&A Document") – with Investor 1 and the Nephew via email and telephone.  Amah had ultimate authority over the Q&A Document's contents, which set out the key terms of the MOSI-IT investment.  At a high level, the plan was for Amah to generate trading profits over three years, and at the end of each year, part of the profits would be donated to the Mountain, part would be reinvested, and part would be distributed to Amah's MOSI-IT advisory clients.

34.     On or about July 28, 2016, Investor 1 emailed twenty Grail Movement members the Q&A Document, a cover letter, and a spreadsheet that Amah had created projecting MOSI-IT profits, soliciting their investment in MOSI-IT.  The Q&A Document provided that "fees and administrative costs" would be deducted from profits, but did not quantify the fees or costs.

35.     None of the materials in Investor 1's email specifically disclosed that all MOSI-IT advisory clients' assets would be invested in Lumine Fund or that, by July 1, 2016, Lumine Fund had lost over 50% of its asset value since inception.  Nevertheless, Amah's spreadsheet projected a monthly return of 8%, annual returns over 75%, and total annual returns over 65% across three years.  Amah's spreadsheet also projected that MOSI-IT would donate approximately $1.5 million to the Mountain over three years.  Amah knew, or was reckless in not knowing, that both his statements regarding the MOSI-IT projections and his omissions regarding Lumine Fund's negative returns were materially false and misleading.

36.     Initially, five Grail Movement members, including Investor 1, invested a total of $300,000 in MOSI-IT.  The investors, who were residents of Nigeria and/or Italy, wired assets from their bank accounts (most of them also in Nigeria or Italy) to ECA Capital's bank account in Pelham, New York.  Amah then transferred the assets to Lumine Fund's accounts in New York and Nebraska.  Amah never told the Fund's Limited Partners, administrator, or auditor about MOSI-IT or his new advisory clients.  Instead, he made it appear as though the MOSI-IT assets were a capital contribution from the Fund's general partner, ECA Capital.

37.     On or about October 25, 2016, Amah began trading $270,000 of the MOSI-IT advisory clients' assets, having retained $30,000 for expenses.

38.     On or about December 3, 2016, over a month after Amah had begun trading MOSI-IT program assets, the Nephew emailed the five MOSI-IT advisory clients ECA Capital IMAs he had received from Amah.  Ultimately, each of the MOSI-IT advisory clients signed a copy of the IMA, and Amah countersigned each IMA on behalf of ECA Capital.

39.     Amah had ultimate authority and control over the IMA's contents, and the signed IMAs demonstrate that Amah and ECA Capital formed an investment advisory relationship with

each individual MOSI-IT client, making clear that the relationship was fiduciary.  In particular, Section 3 of the IMA gave ECA Capital, and thus Amah, power of attorney to act on each client's behalf while Section 4 described that the adviser would provide a "diversified/multi-strategy approach" and outlined the specific types of trading that would be used to effectuate that strategy.  In short, through the IMAs, Amah was memorializing what he had already established through his conduct: that he and ECA Capital were serving as investment advisers to each of the MOSI-IT advisory clients in their individual capacities.

40.   By December 31, 2016, Amah's trading had reduced the $300,000 initial MOSI-IT investment to $81,939.54, a loss of almost 73%.

### IV.   AMAH USED MATERIALLY FALSE AND MISLEADING STATEMENTS TO SOLICIT ADDITIONAL MOSI-IT INVESTMENTS AND TO CONCEAL HIS LOSSES

41.   Despite Amah's knowledge of Lumine Fund's, and thus his MOSI-IT program's, significant losses, Amah repeatedly used materially false and misleading statements and omissions about the investment returns to solicit – directly and through Investor 1 – additional investments.  In general, Amah reported to existing and prospective advisory clients that his MOSI-IT program was modestly profitable and solicited additional investments, claiming that he could generate greater returns if he received more investment capital.

42.   Amah knew at all relevant times, however, that his trading was not profitable because he regularly accessed Lumine Fund's brokerage accounts electronically in connection with his trading activities and saw the Fund's low balances.  Moreover, from 2017 to 2020, after hiring a new fund administrator, Amah regularly provided the fund administrator with the Funds' bank and brokerage account statements so the fund administrator could prepare quarterly account statements.  The Fund's administrator regularly provided Amah with these quarterly account statements so that Amah could approve them.  All of the account statements Amah approved

showed significant net losses, including the statements for ECA Capital's Lumine Fund sub-account where the MOSI-IT advisory clients' assets were held.  Amah, however, did not provide the quarterly account statements to his MOSI-IT advisory clients.  Instead, he repeatedly told them that he was achieving modest returns while soliciting additional investments.

43.    For example, on April 6, 2017, Amah wrote to Investor 1, suggesting that MOSI-IT was achieving a "mere 3% to 3.5% return," and that more investment capital was needed to "achiev[e] a high double or triple digit return."  When Investor 1 requested more information, Amah wrote that he had "alluded to a mere 3% to 3.5% annual return" because "the way the investment has been structured" prevented him from providing "the actual return."

44.    Amah knew that his statements about his MOSI-IT program's returns and his inability to provide its "actual return" were materially false and misleading because about a week prior, on March 28, 2017, he had approved January and February 2017 account statements for the Fund's administrator showing his MOSI-IT advisory clients' losses were in excess of 94%.

45.    Amah, Investor 1, and the Nephew collaborated by email to draft a letter on ECA Capital's letterhead, which Investor 1 emailed to the rest of Amah's MOSI-IT advisory clients on May 15, 2017.  It stated that "at best, we are achieving a modest return of 3-3.5%" and expressed a need for more investment.

46.    At the time of the letter's drafting, Amah knew that his MOSI-IT program was achieving negative returns because a few weeks prior, on April 26, 2017, Amah approved the account statements for the quarter ending March 31, 2017 showing MOSI-IT advisory clients' losses of more than 99%.

47.    From June to December 2017, after receiving Amah's materially false and misleading solicitations, existing MOSI-IT advisory clients (including Investor 1) and a new

advisory client invested another $140,000.  As before, the advisory clients wired the assets from bank accounts abroad to ECA Capital's bank account in Pelham, New York, and Amah then transferred them to Lumine Fund's accounts in New York and Nebraska.  Also as before, Amah invested the new MOSI-IT assets through ECA Capital's sub-account in Lumine Fund and almost immediately began suffering losses.

48.     Nevertheless, in a May 26, 2018 email, Amah told Investor 1 and the Nephew that he was "still projecting modest single digit returns," and solicited additional investments by telling them that he could achieve better returns if the MOSI-IT program received $250,000 by the end of July 2018.

49.     On June 1, 2018, Amah met privately with two prospective advisory clients (a married couple) to solicit their investment in his MOSI-IT program.  According to an email Amah later wrote to Investor 1 and the Nephew, Amah told the prospective advisory clients at the meeting that MOSI-IT was achieving 5% returns.  After hearing Amah's false and misleading statements concerning MOSI-IT's returns, these individuals invested $100,000 in MOSI-IT between June and September 2018.  As before, the advisory clients wired the assets from abroad to ECA Capital's accounts in Pelham, New York, Amah began trading the assets through ECA Capital's sub-account in Lumine Fund, and he almost immediately suffered additional losses.  One of the spouses executed a copy of the IMA described in paragraphs 38 and 39 above, which Amah signed for ECA Capital.

50.     Amah knew that his May and June 2018 statements as to MOSI-IT's returns were materially false and misleading because on May 1, 2018 he approved account statements for the quarter ending March 31, 2018 showing that the MOSI-IT advisory clients' losses exceeded 97%.

V.   **AMAH ENGAGED IN ADDITIONAL DECEPTIVE MISCONDUCT TO PERPETUATE HIS FRAUDULENT SCHEME AND CONCEAL HIS MISCONDUCT**

51.   On June 26, 2018, Amah emailed Investor 1 and the Nephew a performance statement he had fabricated to show the MOSI-IT program's purportedly positive investment performance from inception to May 31, 2018.  The statement falsely showed an investment value of $439,751 on capital of $415,000, for a return of 5.96%.  As Amah knew or was reckless in not knowing, the value of his MOSI-IT advisory clients' investments were actually only $4,907 on May 31, 2018.  Nevertheless, Amah agreed when Investor 1 proposed that the fabricated statement be sent to Amah's other MOSI-IT advisory clients.  The Nephew emailed the statement to the MOSI-IT advisory clients on June 27, 2018.

52.   About a year later, on July 22, 2019, the Nephew emailed the MOSI-IT advisory clients another performance statement Amah had fabricated purporting to show his MOSI-IT program's performance from inception to June 30, 2019.  Although this second fake performance statement communicated – for the first time – trading losses to Amah's MOSI-IT advisory clients, it minimized the true extent of the losses Amah's trading had caused.  In particular, the second fake performance statement represented that the MOSI-IT advisory clients' investment was valued at $325,794.15 (a loss of 36.74% since inception).  Amah knew or was reckless in not knowing that this information was materially false and misleading because two months prior, on May 22, 2019, Amah approved the account statements for the quarter ending March 31, 2019, showing that the MOSI-IT advisory clients' losses exceeded 99%.

53.   Moreover, on July 31, 2019, just days after the second fabricated performance statement was sent to his MOSI-IT advisory clients, Amah approved account statements showing that their investment value as of June 30, 2019 was only $1,859.  Amah never provided his clients with a correction.

14

## VI.   AMAH BREACHED THE FIDUCIARY DUTIES HE OWED TO HIS MOSI-IT ADVISORY CLIENTS BY FAVORING THE FUND OVER THEM

54.    Amah breached the fiduciary duties he owed to his MOSI-IT advisory clients by favoring the Fund over them.  Specifically, he used MOSI-IT advisory clients' assets to pay expenses owed by the Fund.

55.    Lumine Fund's offering documents provided that the Limited Partners would reimburse ECA Capital for Fund expenses, a provision that was not included in the IMAs between ECA Capital and the MOSI-IT advisory clients.  Yet, on May 30, 2017, Amah instructed the Fund's administrator to have ECA Capital absorb the Fund's outstanding expenses.  Because ECA Capital's account was funded exclusively with MOSI-IT advisory clients' money, however, this meant that the MOSI-IT advisory clients were paying the Fund's expenses.

56.    By favoring the Fund over his MOSI-IT advisory clients, Amah breached the fiduciary duties he owed to his MOSI-IT advisory clients, including the duties of care, loyalty, full and fair disclosure, and to act in good faith.

## VII.   AMAH DEFRAUDED INVESTOR 1 AND THE NEPHEW THROUGH SPECIAL PROJECT

57.    Relying in large part on the materially false and misleading statements he made regarding his MOSI-IT investment returns, between March and May 2018, Amah solicited $8,000 from the Nephew and $100,000 from Investor 1 for Special Project.  Amah also solicited Investor 1 and the Nephew to invest in Special Project by projecting double-digit returns within six months and stating that investment profits would be donated to the Mountain.  Like MOSI-IT, Special Project was supposed to pool investor assets for Amah to invest in securities in order to generate returns that would be split between, and later distributed to, the Mountain, Investor 1,

the Nephew, and Amah (in his capacity as an investor), with the latter three splitting their share pro rata.

58.     In particular, Amah induced Investor 1 and the Nephew to invest in Special Project by falsely stating that his MOSI-IT program was achieving positive returns.  At the time he solicited their investments, Amah had told Investor 1 and the Nephew that he was achieving "3% - 3.5% returns" in MOSI-IT, even though he knew that he had suffered essentially a complete loss.

59.     Amah solicited an additional $50,000 from Investor 1 for Special Project in late June 2018, a month after he falsely told Investor 1 MOSI-IT was achieving a "5% return" and two days after distributing the first of the two fabricated MOSI-IT performance statements, saying he needed more money to achieve the projected double-digit returns.

60.     Between March and June 2018, at Amah's instruction, Investor 1 and the Nephew transferred their combined $158,000 in Special Project investments directly to Amah's personal bank account in Larchmont, New York.  From there, Amah transferred their assets into his personal brokerage accounts in Nebraska and Connecticut and began trading their money.

61.     By the end of 2018, Amah had lost almost all of Investor 1's and the Nephew's investments in Special Project.  On April 20, 2019, he told them by email that Special Project had a loss of 79.67%, even though he knew losses were almost 100% based on his regularly accessing his brokerage accounts and the fact that one of his brokerage accounts had been closed. He stated in the same email that he would liquidate and distribute Special Project's assets to investors in June 2019, but Amah never returned any money to Investor 1 or the Nephew.

### FIRST CLAIM FOR RELIEF
### Violations of Section 17(a) of the Securities Act

62.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 61.

63.    Defendant Amah, directly or indirectly, knowingly, recklessly, or negligently, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce, or by use of the mails: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices or courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities.

64.    By reason of the foregoing, Defendant Amah directly or indirectly, violated Section 17(a)(1), (2), and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (2), and (3)].

### SECOND CLAIM FOR RELIEF
### Aiding and Abetting Violations of Securities Act Section 17(a)(2)

65.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 64.

66.    ECA Capital, directly or indirectly, knowingly or recklessly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce, or by use of the mails, obtained money or property by means of untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  By reason of the foregoing, ECA Capital violated Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

67.     By reason of the conduct described above, Amah knowingly or recklessly provided substantial assistance that aided and abetted ECA Capital's violations of Sections 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

68.     By reason of the foregoing, pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77(o)(b)], Amah is liable for those violations.

### THIRD CLAIM FOR RELIEF
#### Violations of Section 10(b) of the Exchange Act and Rule 10b-5

69.     The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 68.

70.     Defendant Amah, directly or indirectly, knowing or recklessly, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact, necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon persons, in connection with the purchase or sale of securities.

71.     By reason of the foregoing, Defendant Amah violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b) and (c)].

### FOURTH CLAIM FOR RELIEF
#### Violation of Sections 206(1) and (2) of the Advisers Act

72.     The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 71.

73.     Defendant Amah (a) while acting knowingly or recklessly, employed devices, schemes, or artifices to defraud clients and prospective clients; and (b) while acting knowingly,

18

recklessly, or negligently, engaged in transactions, practices, and courses of business which operated as a fraud or deceit upon clients and prospective clients.

74.    By reason of the foregoing, Defendant Amah violated Sections 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1)-(2)].

**FIFTH CLAIM FOR RELIEF**
**Violations of Section 206(4) and Rule 206(4)-8 of the Advisers Act**

75.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 74.

76.    By engaging in the conduct described above, Defendant Amah, directly or indirectly, knowingly or recklessly, by use of the means or instrumentalities of interstate commerce: (1) made untrue statements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, to investors or prospective investors in Lumine Fund; and (2) otherwise engaged in acts, practices or courses of business that were fraudulent, deceptive or manipulative with respect to investors or prospective investors in Lumine Fund.

77.    By reason of the foregoing, Defendant Amah violated Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)], and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

**PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that this Court enter a final judgment:

**I.**

Finding that the Defendant violated Sections 17(a)(1), (2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (2) and (3)]; aided and abetted violations of Section 17(a)(2) of the Securities Act [15 U.S.C. §§ 77q(a)(2)]; violated Section 10(b) of the Exchange Act [15 U.S.C. §

78j(b)], and Rules 10b-5(a), (b) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a), (b) and (c)]; and violated Sections 206(1), (2) and (4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2) and (4)], and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8] as alleged in this Complaint;

## II.

Permanently restraining and enjoining Defendant Amah from, directly or indirectly, violating from violating Sections 17(a)(1), (2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (2) and (3)]; Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a), (b) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a), (b) and (c)]; and Sections 206(1), (2) and (4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2) and (4)], and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8] as alleged in this Complaint;

## III.

Ordering Defendant Amah to disgorge all ill-gotten gains and/or unjust enrichment received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)];

## IV.

Ordering the Defendant to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; and

## V.

Granting such other and further relief as the Court may deem just and proper.

Date: <u>August 9, 2021</u>                    Respectfully submitted,


                                             <u>/s/ Eric S. Berelovich</u>
                                             Eric S. Berelovich
                                             U.S. SECURITIES AND EXCHANGE COMMISSION
                                             Division of Enforcement
                                             100 F Street, N.E.
                                             Washington, DC 20549
                                             (202) 551-7799
                                             BerelovichE@SEC.gov

<u>Of Counsel</u>
George Bagnall
Stephan Schlegelmilch
Timothy Work
U.S. SECURITIES AND EXCHANGE COMMISSION
Division of Enforcement
100 F Street, N.E.
Washington, DC 20549