UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

U.S. SECURITIES AND EXCHANGE
COMMISSION,

                                          Plaintiff,

        v.

EVARIST C. AMAH,

                                          Defendant.

No. 21-CV-6694 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances</u>:

Derek S. Bentsen, Esq.
Eric S. Berelovich, Esq.
U.S. Securities and Exchange Commission
Washington, DC
*Counsel for Plaintiff*

Evarist C. Amah
Houston, TX
*Pro Se Defendant*

KENNETH M. KARAS, United States District Judge:

The United States Securities and Exchange Commission ("SEC" or "Plaintiff") brings

this Action against Evarist C. Amah ("Defendant") for violations of the Securities Act, the

Exchange Act, and the Advisers Act.  (*See generally* Compl. (Dkt. No. 1).)  Before the Court is

Plaintiff's Motion for Summary Judgment (the "Motion") against Defendant for all claims

brought in the Complaint.  (*See* Not. of Mot. (Dkt. Nos. 42, 54).)

For the reasons stated herein, Plaintiff's Motion is granted.

## I.  Background

### A.  Factual Background

The following facts are taken from Plaintiff's 56.1 Statement in Support of its Motion

("Pl.'s 56.1") pursuant to Local Civil Rule 56.1.  (*See* Pl.'s 56.1 (Dkt. No. 44).)  Additionally,

where appropriate, the Court cites directly to the admissible evidence submitted by the Parties.[1]

The facts as described below are in dispute to the extent indicated.[2]

---

[1] The Court notes that there are multiple Declarations submitted by Derek S. Bentsen. (*See* Dkt. Nos. 45, 52, 57.)  The Court refers to the declarations at Docket Numbers 45 and 67 (which are identical) as "Bentsen Decl." and the declaration at Docket Number 52 as "Second Bentsen Decl."

[2] Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  Local Civ. R. 56.1(a).  The nonmoving party, in turn, must submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short[,] and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  *Id.* at 56.1(b).  "If the opposing party . . . fails to controvert a fact set forth in the movant's Rule 56.1 statement, that fact will be deemed admitted pursuant to the local rule."  *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (citation and quotation marks omitted); *see also T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (same). "A pro se litigant is not excused from this rule."  *Brandever v. Port Imperial Ferry Corp.*, No. 13-CV-2813, 2014 WL 1053774, at *3 (S.D.N.Y. Mar. 13, 2014) (italics omitted).

Here, Plaintiff filed and served its statement pursuant to Rule 56.1, (*see* Pl.'s 56.1), however Defendant failed to submit a response to Plaintiff's 56.1 Statement of Facts.  (*See generally* Dkt.)  While Plaintiff did not initially file the requisite Local Rule 56.2 notice, Plaintiff, at the Court's direction, filed the requisite Local Rule 56.2 notice upon Defendant and resubmitted its Motion for Summary Judgment.  (*See* Dkt. No. 58.)  The Court allowed Defendant to submit a supplemental response to Plaintiff's resubmitted Motion for Summary Judgment, which Defendant did, however Defendant again failed to submit a response to Plaintiff's 56.1 Statement of Facts.  (*See* Dkt. No. 60.)  Accordingly, the Court may conclude that the facts in Plaintiff's 56.1 Statement are uncontested and admissible.  *See Brandever*, 2014 WL 1053774, at *3 (concluding that because the pro se plaintiff did not submit a Rule 56.1 statement in response to the defendant's statement of facts, "there [were] no material issues of fact"); *Anand v. N.Y. State Div. of Hous. & Cmty. Renewal*, No. 11-CV-9616, 2013 WL 4757837, at *7 (S.D.N.Y. Aug. 29, 2013) (same).

Nevertheless, in light of the "special solicitude" afforded to pro se litigants "when confronted with motions for summary judgment," *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988), the Court will "in its discretion opt to conduct an assiduous review of the record"

From 2012 to June 2020, Defendant was the majority owner and Chief Executive Officer of ECA Capital Management LLC ("ECA Capital"), located in New Rochelle, New York, which he formed in 2012.  (Pl.'s 56.1 ¶¶ 1–2; Bentsen Decl. Ex. 2. ¶¶ 9–10.)  ECA Capital was, in turn, the general partner of Lumine Fund ("Lumine Fund" or "Fund"), a New Rochelle-based fund formed in 2012 which Defendant operated.  (Pl.'s 56.1 ¶ 3; Bentsen Decl. Ex. 2. ¶¶ 10–11.)

In January 2016, Defendant sold limited partnerships in the Fund to two individuals and one entity, raising $265,000 from these investors.  (Pl.'s 56.1 ¶ 5.)  In March 2016, Defendant and his wife invested $32,000 of their own money in Lumine Fund.  (*Id*. ¶ 6; Bentsen Decl. Ex. 2 ¶ 18.)  Before they invested, Defendant emailed to each of the Limited Partners the Limited Partnership Agreement, Subscription Documents, and Private Placement Memorandum (together, the "Fund offering documents").  (Pl.'s 56.1 ¶ 7.)  The Fund offering documents stated that each Limited Partner agreed to pay both a monthly management fee of 1% or 2% (annualized) of their account balance and a quarterly performance fee of 40% of their net capital appreciation.  (*Id*.)

---

when deciding the instant Motion, *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (quotation marks omitted).  *See also Houston v. Teamsters Local 210, Affiliated Health & Ins. Fund–Vacation Fringe Ben. Fund*, 27 F. Supp. 3d 346, 349 (E.D.N.Y. 2014) ("Although [the] plaintiffs did not file a Rule 56.1 statement, the Court has independently reviewed the record to ensure that there is uncontroverted evidence to support the paragraphs referenced in [the] defendants' Rule 56.1."); *Pagan v. Corr. Med. Servs.*, No. 11-CV-1357, 2013 WL 5425587, at *2 (S.D.N.Y. Sept. 27, 2013) (explaining that "[t]he [c]ourt ha[d] considered the [motions for summary judgment] in light of the entirety of the record to afford [the pro se] [p]laintiff the special solicitude to which he [was] entitled" where the plaintiff failed to submit a Rule 56.1 response); *Cherry v. Byram Hills Cent. Sch. Dist.*, No. 11-CV-3872, 2013 WL 2922483, at *1 (S.D.N.Y. June 14, 2013) ("[W]here a pro se plaintiff fails to submit a proper . . . Rule 56.1 statement in opposition to a summary judgment motion, the [c]ourt retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions."  (italics, citation and quotation marks omitted)).

Defendant had exclusive control over the Fund offering documents.  (*Id*. ¶ 8.)  Defendant also selected and communicated with the Fund's financial institutions and service providers, analyzed its investment options, controlled its assets with complete discretion, and invested them on the Fund's behalf.  (*Id*. ¶ 9.)  The fund administrator communicated with Lumine Fund's limited partners regarding its performance.  (*Id*. ¶ 10.)  Defendant began trading the Fund's $265,000 on January 19, 2016 and, by April 1, 2016, Defendant's trading losses had reduced the Fund's capital to approximately $123,000, a negative return of over 50%.  (*Id*. ¶ 11.)

Defendant is a member of a religious organization called the Grail Movement.  (*Id*. ¶ 12.)  The Grail Movement has its origins in Vomperberg, Austria, where adherents have established a settlement, referred to as "the Mountain," that hosts festivals and other religious activities.  (*Id*.)  In April 2016, Defendant and Dr. Kanayo Nwanze ("Nwanze"), another adherent of the Grail Movement, began discussing an investment idea, which would be open to Grail Movement members, for the purpose of benefitting the Mountain and generating returns for investors.  (*Id*. ¶ 13; Def.'s Mem. 2.)  In the following months, Defendant communicated with Nwanze and Kanayo Okonji ("Okonji"), Nwanze's nephew, by email, phone and in person to discuss a trading idea which they called "Mountain Support Initiative – Investment Trading" or "MOSI-IT."  (Pl.'s 56.1 ¶ 14.)  "MOSI-IT" was originally Nwanze's idea.  (Bentsen Decl. Ex. 6, at 26:15–21.)  Defendant, with assistance from Nwanze and Okonji, offered the MOSI-IT investment as a pooled investment vehicle and suggested generally, without naming Lumine Fund, that the MOSI-IT investments be traded through Defendant's "hedge fund."  (*Id*. ¶ 15.)  Defendant agreed to trade for MOSI-IT.  (*Id*. ¶ 16.)  Defendant also drafted, reviewed, and/or edited MOSI-IT's offering documents and investor communications, designed the investment structure and other key details of the MOSI-IT offering, designed and implemented its

4

investment strategy, prepared performance updates for investors, and had discretionary control over the investment assets.  (*Id*. ¶ 17.)  Defendant traded securities and other financial assets. (*Id*. ¶ 18.)

In a May 3, 2016 email, Defendant proposed to Nwanze and Okonji that MOSI-IT investments be traded through his "hedge fund," suggested a $1 million initial investment, and projected "a first year return in excess of 100%."  (Pl.'s 56.1 ¶ 21; Bentsen Decl. Ex. 8.) Defendant made no mention of the above-described substantial losses that had already occurred in the Fund earlier in 2016.  (Pl.'s 56.1 ¶ 21; Bentsen Decl. Ex. 8.)  From May 17 to July 28, 2016, Defendant helped prepare MOSI-IT's offering documents to potential investors, which set out key terms of the MOSI-IT investment.  (Pl.'s 56.1 ¶ 22.)  The investment plan was for Defendant to generate trading profits over three years, and, at the end of each year, part of the profits would be donated to the Mountain, part would be reinvested, and part would be distributed to MOSI-IT investors.  (*Id*.)  On or about July 28, 2016, Nwanze emailed Grail Movement members the Q&A Document, a cover letter, and a spreadsheet that Defendant had created projecting MOSI-IT profits, soliciting their investment in MOSI-IT.  (*Id*. ¶ 23.)  The Q&A document provided that "fees and administrative costs" would be deducted from profits but did not quantify the fees or costs.  (*Id*.)  None of the materials in Nwanze's email specifically disclosed that all MOSI-IT advisory clients' assets would be invested in Lumine Fund or that, by July 1, 2016, Lumine Fund had lost over 50% of its asset value since inception.  (Pl.'s 56.1 ¶ 24.) Rather, Defendant's spreadsheet projected a monthly return of 8%, annual returns over 75%, and total annual returns over 65% across three years.  (*Id*.)  Defendant's spreadsheet also projected that MOSI-IT would donate approximately $1.5 million to the Mountain over three years.  (*Id*.)

Five Grail Movement members (including Nwanze) made initial investments totaling $300,000 in MOSI-IT.  (*Id.* ¶ 26.)  Defendant did not formally establish MOSI-IT as a legal entity.  (*Id*. ¶ 19.)  Instead, Defendant pooled his MOSI-IT investors' assets and deposited them into, and beginning in November 2016 managed them through, ECA Capital's sub-account in Lumine Fund.  (*Id*. ¶¶ 20, 27.)  MOSI-IT investors did not receive Lumine Fund offering documents and were not informed about Lumine Fund fees.  (*Id.* ¶ 25.)  Defendant signed investment management agreements ("IMAs") on ECA Capital's behalf with each MOSI-IT client stating that the "amount deposited shall be transferred to Lumine Fund and actively traded by the manager," and that net profits were "after management and performance fees" which was not defined in the agreement.  (Pl.'s 56.1 ¶¶ 32–34; Bentsen Decl. Ex. 10.)  Nwanze suggested the use of ECA Capital's management account for MOSI-IT.  (Def.'s Mem. Ex. 5, at 7:15–19; Def.'s Mem. Ex. 6.)

Defendant alone designed MOSI-IT's investment strategy and had discretionary control over its investment assets.  (Pl.'s 56.1 ¶ 28.)  Defendant never told the Fund's administrator about MOSI-IT or his new advisory clients.  (*Id.* ¶ 29.)  By December 31, 2016, Defendant's trading had reduced the $300,000 initial MOSI-IT investments to $81,939.54.  (*Id.* ¶ 35.)

Defendant notes that "Nwanze and other participants knew that [D]efendant was engaging in high-risk speculative trades and encouraged it," pointing to the IMA between ECA Capital and Nwanze which states: "A Limited Partner could incur substantial, or even total, losses on an investment in the Partnership.  An investment in the Partnership is only suitable for persons willing to accept this high level of risk."  (Mem. of Law for Reply to Mot. for Summary Judgment ("Def.'s Mem.") 4 (Dkt. No. 49); Def.'s Mem Ex. 13.)

Defendant posits that "[t]he relationship [] [D]efendant had with the Lumine Fund investors was completely different from his relationship with the MOSI-IT participants. . . . The agreement signed by the MOSI-IT investors only referenced fees for third party providers, including brokerage fees, commissions to brokers, accounting fees, audit fees, third party administrator fees.  It did not refer to any compensation for [] [D]efendant."  (Def.'s Mem. 1.)  In support, Defendant points to an email which lists  "3rd party fund administration fees" as "[o]ther costs" and additionally lists the "cost of annual audit" and "tax accountants."  (Def.'s Mem. Ex 1.)  Defendant states that he "traded for MOSI-IT on a voluntary basis, without compensation, as part of his volunteer activities for the Grail Movement; not as an 'investment adviser' within the meaning of Section 202(a)(11) of the Advisers Act."  (Def.'s Mem. 1.)  Indeed, "[D]efendant denies being an 'investment adviser' to the participants at all relevant times, within the meaning of Section 202(a)(11) of the Advisers Act as the participants did not pay any form of compensation to [D]efendant nor was there any compensation clause in the agreements signed by the participants."  (Bentsen Decl. Ex. 2. ¶ 9.)  Defendant additionally points to the fact that he used his own resources totaling "about $30,000" to pay fees on behalf of MOSI-IT.  (Def.'s Mem. 3; Def.'s Mem. Ex. 7.)

From 2017 to 2020, after hiring a new fund administrator (Fleming Fund Services) Defendant provided the fund administrator with Lumine Fund's bank and brokerage statements so the fund administrator could prepare quarterly account statements.  (Pl.'s 56.1 ¶ 37.)  The fund administrator regularly provided Defendant with these quarterly account statements so Defendant could approve them.  (*Id.* ¶ 38.)  All of the quarterly account statements approved by Defendant showed significant net losses, including the statements for ECA Capital's Lumine Fund sub-

account where the MOSI-IT investments were held.  (*Id.* ¶ 39.)  Defendant did not provide the quarterly account statement to MOSI-IT investors.  (*Id.* ¶ 40.)

Defendant regularly accessed Lumine Fund's brokerage accounts electronically in connection with his trading activities and saw the Fund's balances and therefore knew that his trading was not profitable.  (*Id.* ¶ 36.)  Defendant has testified that he was aware that excluding new investor funds, Lumine Fund "probably" never had a net positive return from inception. (Second Bentsen Decl. Ex. 2, at 200:5–7.)  Defendant additionally testified that in March 2017, he was aware that the Fund "was down substantially" and more specifically, was down negative 81.04%.  (*Id.* at 198:23–99:12.)  On March 28, 2017, Defendant approved February 2017 account statements for Lumine Fund's administrator showing an account value of $15,535.18 which represented MOSI-IT investor losses of over 94%.  (*Id.* ¶ 44.)

Defendant testified that when it came to communicating investment returns to investors "Nwanze only knew about MOSI-IT's investment returns because [Defendant] told him what the investment returns were."  (Second Bentsen Decl. Ex. 1, at 117:23–118:7.)  Nwanze testified that he relied on Defendant completely for information related to the investments.  (Pl.'s 56.1 ¶ 50; Bentsen Decl. Ex. 6, at 42:9–18.)  In an April 6, 2017 email, Defendant suggested to Nwanze that MOSI-IT was achieving a "mere 3% to 3.5% return," and that more investment capital was needed to "achiev[e] a high double or triple digit return."  (Pl.'s 56.1 ¶ 41.)  In that email, Defendant offered to guarantee returns of 10% if investors increased MOSI-IT capital to one million dollars.  (*Id.* ¶ 42.)  Defendant did not disclose the extent of the Lumine losses in that email.  (Bentsen Decl. Ex. 4, at 212:10–16.)  On April 16, 2017, in response to an inquiry from Nwanze, Defendant wrote that he alluded to a mere 3% to 3.5% annual return" because "the way the investment has been structured" prevented him from providing "the actual return," but that

3% to 3.5% was what his "current projections indicate" and reiterated the need for additional capital to generate higher returns. (Pl.'s 56.1 ¶ 43.) Defendant repeatedly contended that to achieve returns higher than 3–3.5% he required a higher capital base. (*Id*. ¶ 46.)

Defendant points out that Nwanze "altered" an April 2017 "update prepared by [] [D]efendant and forwarded the revised version to his nephew." (Def.'s Mem. 4; Def.'s Mem. Ex. 11.) The email Defendant points to from Nwanze attaches a "revised version of the ECA report on MOSI-IT." (Def.'s Mem. Ex. 11.) The email attachment primarily discusses the "target . . . level of capitalization" and total investment dollar amounts in MOSI-IT. (*Id*.)

On April 26, 2017, Defendant approved account statements for the quarter ending March 31, 2017 which showed ECA Capital's sub-account in Lumine Fund had a value of $2,228.55 which reflected a loss of 97.28% for the quarter. (Pl.'s 56.1 ¶ 47.) The account statement for the quarter ending March 31, 2017 for the ECA Capital Management sub-account in Lumine Fund represented a loss of more than 99% since inception. (*Id*. ¶ 48.)

Defendant testified that he "believe[s] he discussed" the losses with Nwanze. (Bentsen Decl. Ex. 4, at 212:12.) Defendant testified that "to the best of [his] recollection" he believes he told Nwanze that MOSI-IT had suffered a 99% loss but could not remember when or how he communicated this to Nwanze. (Second Bentsen Decl. Ex. 2, at 225:15–228:6.) Defendant could not recall if anyone else was present when he told Nwanze, "what [he] said to [] Nwanze," what Nwanze said in response, or "what transpired" after he told Nwanze. (*Id*.) Ultimately, Defendant testified he was "not sure" whether he told Nwanze about the loss and that he was "not 100 percent sure what [he] discussed with [] Nwanze or when regarding [the] 99 percent loss." (*Id*. at 228:12; 249:20–22.) At a May 2017 meeting at which Nwanze and Okonji were

present, Nwanze testified that Defendant "certainly did not report any losses." (Second Bentsen Decl. Ex. 4, at 39:10–40:10.)

Defendant explains that his projections started at 100% given the expected initial capital of $1 million which was dramatically reduced to a 3–5% projected return to "take the losses into account especially given only $270,000 was raised and deployed as capital," and that the "losses were inherent in the circa 97% reduction in the projected return." (Def.'s Mem. 3.) Defendant additionally states that he "achieved verified trading returns in 2015 of about 250% despite [] [D]efendant having significant drawdowns during that year" indicating that "recovering from significant drawdowns is possible" and that there are "numerous examples of other traders achieving outstanding returns, against all odds." (*Id*. at 3–4.) Defendant also notes that "Nwanze confirmed during his deposition that [Defendant] shared [his] projections and the basis of those projections with [Nwanze]." (*Id*. at 3.) In support, he cites to the Nwanze Deposition where Nwanze, in response to questioning regarding whether Defendant shared the basis of his April 16, 2017 projections, responded that Defendant provided figures for the "total capital investments and the investment returns and the percentages based on the markets and based on the level of capital contributions" and that Defendant "would have explained to us that that was how the market was running or going at that time." (Second Bentsen Decl. Ex. 4, at 37:16– 38:6.)

From June to December 2017, existing and new MOSI-IT investors provided another $140,000 which was invested in ECA Capital's sub-account in Lumine Fund. (Pl.'s 56.1 ¶ 49.) On May 1, 2018, Defendant approved an account statement for the quarter ending March 31, 2018 showing that MOSI-IT investor capital had been reduced to just $10,369.46. (*Id*. ¶ 51.) Later that month, on May 26, 2018, Defendant sent Nwanze and Okonji an update that

"project[ed] [a] modest single digit returns" and again suggested larger returns if additional

capital could be procured.  (*Id*. ¶ 52.)  The update noted that the agreement at the last MOSI-IT

meeting held in Vomperberg, Austria that "[a]dditional capital would be raised urgently to get

the total trading capital to at least USD 500,000 . . . has not been done," that the "inability of the

team to raise adequate capital is seriously impacting the performance of the fund," and that the

"ideal minimum trading capital should be $1M as initially indicated."  (Bentsen Decl. Ex. 16.)

Defendant also noted that his single digit return projection could "change positively, if additional

funds of at least $250,000 are injected by latest end of July 2018 to start trading August 1, 2018.

This will enable the fund to re-focus to an active volatility-based short-term trading strategy

given the present highly volatile market."  (*Id*.)  Nwanze responded that same day stating:

> [I]t will certainly not be an encouraging report to current investors.  The last
> meeting agreed that we needed to attain a $500,000.00 investment capital, that is,
> up from less than $300,000.00 as was the case at that time.  Now you refer to an
> additional $250,000.00 within 2 months when we could only raise an additional
> $100,000.00 over the last year.
>
> Additionally, the report does not give any indicative figures of achieved dividends
> even with the low medium term investment.  It refers to "modest single digit
> returns," which is rather vague.  A report like this that is gloomy would not
> encourage any investor to dig into his pocket.
>
> I suggest you make the report more positive and up-beat, urging investors that this
> is the time to invest in volatility short-term market portfolios and show a
> hypothetical scenario that compares returns from the present portfolio with a
> projected high-risk but high-yield strategy.
>
> Please revise accordingly.

(Def.'s Mem. Ex. 14.)

Days later, on June 1, 2018, Defendant met with prospective MOSI-IT investors, a

married couple ("the Married Couple"), whom he characterized as risk-averse, and told them that

MOSI-IT was projected to achieve a return of 5%.  (Pl.'s 56.1 ¶ 53; Bentsen Decl. Ex. 21.)  After

11

meeting with Defendant, the Married Couple chose to invest $100,000 in MOSI-IT which was placed in ECA Capital's sub-account in Lumine Fund.  (Pl.'s 56.1 ¶ 53.)

On June 26, 2018, Defendant emailed a file to Nwanze and Okonji that purported to be "the MOSI-IT performance report from inception to May 21, 2018" ("May 2018 Performance Statement").  (*Id.* ¶ 54.)  On June 27, 2018, in response to an email from Nwanze, Defendant advised that the performance statement should be included in minutes of a MOSI-IT meeting as an annex.  (Bentsen Decl. Ex. 23.)  On June 27, 2018, Okonji emailed the relevant meeting minutes and performance statement to investors.  (Bentsen Decl. Ex. 24.)  The May 2018 Performance Statement claimed that MOSI-IT's investments had a total value of $439,751 which indicated a gain of $24,751 or approximately 6%.  (Pl.'s 56.1 ¶ 57.)  Defendant admitted that the value and returns in the May 2018 Performance Statement were inaccurate and misleading.  (*Id.* ¶ 58.)  At the time of the May 2018 performance statement, MOSI-IT contributions had increased from the initial $300,000 to $415,000.  (*Id.* ¶ 59.)

On May 22, 2019, Defendant approved an account statement for the quarter ending March 31, 2019 that reflected that the ECA Capital sub-account in Lumine Fund had $3,034.10.  (*Id.* ¶ 60.)  On July 22, 2019, Okonji emailed to investors two documents provided by Defendant, one entitled "MOSI-IT Performance – June 2019.pdf."  (*Id.* ¶ 61.)  The "MOSI-IT Performance – June 2019.pdf" reported that MOSI-IT had, as of the month ending June 30, 2019, a value of $325,794.15 which reflected a loss of $214,205.85 or 41.59%.  (*Id.* ¶ 62.)  The second document attached to the July 22, 2019 email reported that these investment losses, themselves underreported, were a result of events occurring in the prior two months.  (*Id.* ¶ 63.)

The brokerage statement for Lumine Fund ending on June 30, 2019 reflected a total value of $1,742.51.  (*Id.* ¶ 65.)  Lumine Fund had $139.50 in its bank account as of June 30, 2019.  (*Id.*

¶ 66.)  Defendant admitted that the value of investments reflected in the June 2019 performance statement was incorrect and explained it was a mistake.  (Bentsen Decl. Ex. 5, at 23:24–24:3.) Defendant testified that once he realized the mistake, he "let the person that received it from [him] know and, also, [] Nwanze."  (*Id*. at 24:7–14.)  Defendant testified that the performance statement was corrected by an email sent from the fund administrator on January 19, 2020.  (Pl.'s 56.1 ¶ 67.)  Defendant notes that he lost his mother in early 2019 and was "under immense pressure at the time and believes that the heightened stress level led to the error with the wrong report that he sent to [] Okonji."  (Def.'s Mem. 5; Def.'s Mem. Ex. 16.)  On July 27, 2019, in response to an investor question regarding the losses specified in the June 2019 Performance Statement, Defendant did not advise that the performance statement was incorrect, but rather replied "it's part of the ebbs and flows of the market, hence my advise [sic] that there's no reason to panic."  (Pl.'s 56.1 ¶ 71.)  By June 2019, total contributions in MOSI-IT had increased to $515,000 due to new investments.  (*Id*. ¶ 69.)

Nwanze testified that in a May 2019 meeting with investors, Defendant had assured them their capital was intact.  (*Id*. ¶ 70.)  According to Nwanze, the June 2019 performance statement was the first time Defendant reported any loss.  (*Id*. ¶ 68, Bentsen Decl Ex. 6, at 52:3–11.)

The July 2019 account statement for Lumine Fund's brokerage account indicated that as of July 27, 2019, it held no positions and had $2,350.90 in cash.  (Pl.'s 56.1 ¶ 72.)  Defendant signed a letter for investors dated August 14, 2019 in which he again did not indicate the June 2019 performance statement was incorrect, but rather referenced the "40%+ drop in investment portfolio value" that was stated in that performance statement.  (*Id*. ¶ 73.)  On July 31, 2019, Defendant approved account statements showing that the value of MOSI-IT investments was $1,859.  (*Id*. ¶ 74.)

Separate from MOSI-IT, Defendant engaged in another investment agreement called MOSI-IT Special Project which was an agreement in April 2018 between Nwanze and Okonji and Defendant which involved trading in Defendant's personal brokerage account.  (*Id*. ¶ 75.)  Nwanze ultimately contributed $150,000 in two installments to MOSI-IT Special Project, $50,000 of which was transferred the day after Nwanze received the MOSI-IT May 2018 Performance Statement, and Okonji contributed $8,000.  (*Id*. ¶ 76.)  At this time, Defendant had already told both investors that he was projecting "3%–3.5% returns" in MOSI-IT, even though he knew that he had suffered essentially a complete loss.  (*Id*. ¶ 43.)  Nwanze testified that he entered into the MOSI-IT Special Project based on Defendant's representations of MOSI-IT's performance and would not have contributed funds had he been aware of MOSI-IT's losses.  (*Id*. ¶ 77.)  Defendant notes that "[w]e embarked on the Special Project because the initial MOSI-IT project was not going well, and we were looking for ways to shore up the program.  If the MOSI-IT program were going well, we would have made transfers to the International Grail Movement (Mountain) as agreed upon at the start of the program.  There were no transfers/donations to the Mountain because [] Nwanze knew that the program was not going well."  (Def.'s Mem. 7.)  MOSI-IT Special Project suffered total losses and no money was returned to investors.  (Pl.'s 56.1 ¶ 78.)

B.  Procedural History

Plaintiff filed the Complaint on August 9, 2021.  (Dkt. No. 1.)  Defendant answered the Complaint on September 24, 2021.  (Dkt. No. 9.)  Discovery was completed on July 21, 2022.  (*See* Dkt. (Minute Entry for July 21, 2022).)  Plaintiff filed the instant Motion on November 7, 2022.  (*See* Pl.'s Mem. of Law in Supp. of Mot. for Summary Judgment ("Pl.'s Mem.") (Dkt. No. 43).)  Defendant submitted his Opposition on January 3, 2023.  (*See* Def.'s Mem.)  Plaintiff

14

replied on January 20, 2023.  (*See* Reply to Mot. ("Def.'s Reply Mem.") (Dkt. No. 50).)  Plaintiff did not initially file the requisite Local Rule 56.2 notice, so Plaintiff, at the Court's direction, filed the requisite Local Rule 56.2 notice upon Defendant and resubmitted its Motion for Summary Judgment on June 12, 2023.  (*See* Dkt. Nos. 54–59.)  The Court allowed Defendant to submit a supplemental response to Plaintiff's resubmitted Motion for Summary Judgment, which Defendant did on July 12, 2023, stating that he "respectfully confirms that he stands by his response."  (*See* Dkt. No. 60.)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (same); *Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In deciding whether to award summary judgment, the court must construe the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor."  *Torcivia v. Suffolk County*, 17 F.4th 342, 354 (2d Cir. 2021); *see also Horror Inc. v. Miller*, 15 F.4th 232, 240 (2d Cir. 2021) (same).  "It is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Red Pocket, Inc. v. Interactive Commc'ns Int'l, Inc.*, No. 17-CV-5670, 2020 WL 838279, at *4 (S.D.N.Y. Feb. 20, 2020) (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non[-]movant's claim," in which case "the non[-]moving party must

come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration, citation, and quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . . , [a non-movant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (citation omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharms. Tech. Corp. v. Barr Laby's. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex*, 477 U.S. at 323–24).

When ruling on a motion for summary judgment, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*,

164 F.3d 736, 746 (2d Cir. 1998).  "[W]here a party relies on affidavits or deposition testimony to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.'"  *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)); *see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . ."); *Baity*, 51 F. Supp. 3d at 419 (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (citation omitted)).

Finally, the Second Circuit has instructed that when a court considers a motion for summary judgment, "special solicitude" should be afforded a pro se litigant, *see Graham*, 848 F.2d at 344; *accord Mercado v. Div. of N.Y. State Police*, No. 96-CV-235, 2001 WL 563741, at *7 (S.D.N.Y. May 24, 2001) (same), and a court should construe "the submissions of a pro se litigant . . . liberally" and interpret them "to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (italics and quotation marks omitted).  Moreover, "the failure to oppose a motion for summary judgment alone does not justify the granting of summary judgment."  *Vt. Teddy Bear Co.*, 373 F.3d at 244; *see also Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014) (explaining that "an examination of the legal validity of an entry of summary judgment should . . . be[ ]made in light of the opposing party's pro se status" (italics omitted)).  "Nonetheless, proceeding pro se does not otherwise relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald assertions unsupported by evidence . . .  are insufficient to overcome a motion for summary

judgment." *Houston*, 27 F. Supp. 3d at 351 (alterations, italics, and quotation marks omitted);
*see also Flores v. City of New York*, No. 15-CV-2903, 2017 WL 3263147, at *2 (S.D.N.Y. July
31, 2017) (same).

    B.  Analysis

        1.  Exchange Act Section 10(b), Rule 10b-5, and Securities Act Section 17(a)

      Section 10(b) of the Securities Exchange Act makes it unlawful to "use or employ, in
connection with the purchase or sale of any security registered on a national securities exchange
. . . any manipulative or deceptive device or contrivance in contravention of such rules and
regulations as the Commission may prescribe."  15 U.S.C. § 78j(b).  Rule 10b-5, promogulated
by the SEC to implement Section 10(b), states, in relevant part, that it is "unlawful for any
person, directly or indirectly, by the use of any means or instrumentality of interstate commerce
. . . (a) [t]o employ any device, scheme, or artifice to defraud"; "(b) [t]o make any untrue
statement of a material fact or to omit to state a material fact necessary in order to make the
statements made . . . not misleading"; or "(c) [t]o engage in any act, practice, or course of
business which operates or would operate as a fraud or deceit upon any person."  17 C.F.R. §
240.10b-5.  To establish liability under Section 10(b) and Rule 10b-5, the SEC must demonstrate
that a defendant "(1) made a material misrepresentation or a material omission as to which he
had a duty to speak; (2) with scienter; (3) in connection with the purchase or sale" of
securities.  *SEC v. Im*, No. 17-CV-3613, 2020 WL 4937465, at *2 (S.D.N.Y. Aug. 24, 2020)
(citation and quotation marks omitted).

      Section 17(a) of the Securities Act prohibits "any person in the offer or sale of any
securities" from "directly or indirectly" (1) "employ[ing] any device, scheme, or artifice to
defraud;" (2) "obtain[ing] money or property by means of any untrue statement of a material fact

or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;" or (3) "engag[ing] in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."  15 U.S.C. § 77q(a).  Courts in the Second Circuit have understood that "[t]he same elements required to establish a section 10(b) violation and a Rule 10b–5 violation suffice to establish a violation under sections 17(a)(1)-(3) of the [Securities] Act, with the exception that scienter is not required for the SEC to enjoin violations under subsections (a)(2) or (a)(3)."  *SEC v. Nadel*, 97 F. Supp. 3d 117, 122 (E.D.N.Y. 2015) (second alteration in original) (citation and quotation marks omitted); *see also SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999) ("Essentially the same elements are required under Section 17(a)(1)-(3) in connection with the offer or sale of a security, though no showing of scienter is required for the SEC to obtain an injunction under subsections (a)(2) or (a)(3)"); *SEC v. Mattera*, No. 11-CV-8323, 2013 WL 6485949, at *9 (S.D.N.Y. Dec. 9, 2013) ("[I]f a seller is liable under section 10(b), it is necessarily liable under section 17(a).").  Section 17(a)(2) specifically requires that a defendant "obtain money or property" by means of a material misrepresentation or omission. *SEC v. Hurgin*, No. 19-CV-5705, 2022 WL 4448561, at *8 (S.D.N.Y. Sept. 23, 2022).

### a.  Material Misrepresentation or Omission

The SEC, pointing to a series of projections Defendant made, argues that "[Defendant] fraudulently projected positive returns when offering the MOSI-IT program to potential investors."  (Pl.'s Mem. 12.)  The SEC first points to "a May 2016 email to [] Nwanze and [] Okonji, [where] Defendant stated that MOSI-IT investments [] would be traded through his 'hedge fund' and projected 'a first year return in excess of 100%.'"  (*Id.*; Pl.'s 56.1 ¶ 21.)  The SEC contends that "Defendant's predictions to these investors were materially false and

misleading because Defendant did not disclose the extent of the losses he had already incurred through his trading for his hedge fund—Lumine Fund—which at that point were over 50% of the invested principal." (Pl.'s Mem. 12.)  Additionally, the SEC cites to the July 2016 spreadsheet Defendant created for Nwanze to send to potential MOSI-IT investors which projected a monthly return of 8%, annual returns over 75%, and total annual returns over 65% across three years for MOSI-IT.  (Pl.'s Mem. 13; Pl.'s 56.1 ¶¶ 23–24.)  The SEC argues that "[n]one of the materials that [] Nwanze sent to potential investors disclosed that all MOSI-IT advisory clients' assets would be invested in Lumine Fund or that, by July 1, 2016, Lumine Fund had lost over 50% of its asset value since inception."  (Pl.'s Mem.13; Pl.'s 56.1 ¶¶ 23–24.)  The SEC notes that "[t]wo years later, in June 2018—after [Defendant] lost 99 percent of the MOSI-IT investments— [Defendant] met the Married Couple" and told them "he projected MOSI-IT to achieve 5% returns" after which "the Married Couple invested $100,000 in MOSI-IT between June and September 2018."  (Pl.'s Mem. 13.)  Finally, the SEC argues that Defendant "made additional materially false and misleading statements and omissions to [] Nwanze and [] Okonji to induce them to invest in Special Project." (*Id*. at 14.)  Between March and May 2018, Okonji contributed an additional $8,000 and Nwanze contributed an additional $100,000 for Special Project, with an additional $50,000 from Nwanze in June 2018, one day after Defendant sent the May 2018 Performance Statement to Nwanze—in which Defendant falsely claimed that MOSI-IT's investments had increased by approximately 6%.  (Pl.'s 56.1 ¶¶ 54, 57–58, 76; Bentsen Decl. Ex. 1 ¶¶ 57–59; Bentsen Decl. Ex. 2 ¶¶ 57–59.)  These investments occurred after Defendant had on multiple occasions projected positive returns for the MOSI-IT investment— including predicting a 3% to 3.5% return on April 16, 2017 and single digit returns on May 26, 2018 to Nwanze and Okonji.  (Pl.'s 56.1 ¶¶ 21, 24, 41, 43, 52, 53.)

i.  Maker

In *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), the

Supreme Court held that, in order to be liable for a violation of Rule 10b–5,—which as noted

makes it unlawful for "any person, directly or indirectly, . . . [t]o make any untrue statement of a

material fact" in connection with the purchase or sale of securities, 17 C.F.R. § 240.10b–5(b)—a

defendant must have "made" the allegedly material misstatements.  564 U.S. at 141.  The

Supreme Court explained in *Janus* that "to make," means "to state" and not "to create."  *Id*. at

142.  The Supreme Court adopted the following rule for determining whether a defendant is the

"maker of a statement": "For purposes of Rule 10b–5, the maker of a statement is the person or

entity with ultimate authority over the statement, including its content and whether and how to

communicate it."  *Id*. at 142; *see also id*. at 144 ("Without [ultimate] authority, it is not necessary

or inevitable that any falsehood will be contained in the statement." (quotation marks omitted)).

The Court further explained:

> Without control, a person or entity can merely suggest what to say, not "make" a
> statement in its own right.  One who prepares or publishes a statement on behalf
> of another is not its maker.  And in the ordinary case, attribution within a
> statement or implicit from surrounding circumstances is strong evidence that a
> statement was made by—and only by—the party to whom it is attributed.  This
> rule might best be exemplified by the relationship between a speechwriter and a
> speaker.  Even when a speechwriter drafts a speech, the content is entirely within
> the control of the person who delivers it.  And it is the speaker who takes credit—
> or blame—for what is ultimately said.

*Id*. at 142–43.  "In the post-*Janus* world, an executive may be held accountable where the

executive had ultimate authority over the company's statement; signed the company's statement;

ratified and approved the company's statement; or where the statement is attributed to the

executive."  *In re Fannie Mae 2008 Sec. Litig*., 891 F. Supp. 2d 458, 473 (S.D.N.Y. 2012), *aff'd*,

525 F. App'x 16 (2d Cir. 2013) (summary order).  "Whether a defendant is the 'maker' of the

21

misstatement may depend on inferential or circumstantial evidence." *In re Weight Watchers Int'l Inc. Sec. Litig.,* 504 F. Supp. 3d 224, 261 (S.D.N.Y. 2020).

Defendant testified he was "the only person who accessed the accounts that were used for MOSI-IT trading" and that no one else besides him "analyze[d] investment options." (Second Bentsen Decl. Ex. 1, at 117:23–19:15.)  Indeed, Defendant admitted he "design[ed] [MOSI-IT's] investment strategy." (Bentsen Decl. Ex. 2 ¶ 29.)  Defendant additionally testified and that no one else besides him, except for the administrators of the fund, who he claims only communicated with Nwanze once in 2019, communicated with Nwanze regarding the investment returns. (Second Bentsen Decl. Ex. 1, at 117:23–18:15.)  Accordingly, there is no dispute that Defendant had ultimate authority over the content of the multiple projections he made, which he alone determined, and over his communication of those projections to Nwanze, Okonji, and the Married Couple—indeed, he is clearly *Janus*'s proverbial speaker, not speechwriter. *See Moon Joo Yu v. Premiere Power LLC*, No. 14-CV-7588, 2018 WL 456244, at *10 (S.D.N.Y. Jan. 17, 2018) ("*Janus* did not change the longstanding rule that corporate officials are liable for misstatements to which they give their imprimatur." (citation and quotation marks omitted)).[3] Additionally, Defendant had ultimate control over the May 2018 Performance Statement which Defendant sent to Nwanze and Okonji from ECA Capital, of which he was the majority owner and CEO. *See In re Lehman Bros. Sec. & ERISA Litig.*, 11-CV-4278, 2013 WL 5730020, at *2

---

[3] Specifically, Defendant projected "a first year return in excess of 100%" if $1 million in initial investment was raised in May 2016 and predicted a 3% to 3.5% return in April 2017 to Nwanze and Okonji without disclosing prior losses. (Pl.'s 56.1 ¶¶ 21, 43.)  Defendant additionally projected monthly returns of 8%, annual returns over 75%, and total annual returns over 65% across three years for MOSI-IT if $1 million in initial investment to Nwanze. (*Id.* ¶ 24.)  On May 26, 2018, Defendant sent Nwanze and Okonji an update that "project[ed] [a] modest single digit returns." (*Id.* ¶ 52.)  Finally, in June 2018, Defendant met the Married Couple and told them he projected MOSI-IT to achieve 5% returns. (*Id.* ¶ 53.)

(S.D.N.Y. Oct. 22, 2013) (holding that defendants were the makers of the statements contained therein when the defendants were the CEO and CFO of the companies whose financial statements were reported and the statements "were explicitly attributed to [the company] in the offering memorandum").

### ii.  Misrepresentation or Omission

Defendant contends that he "[d]id [n]ot [u]se [a]ny [f]alse or [m]isleading [s]tatements" and that he did not "solicit" investors, something he says was done by Nwanze.  (Def.'s Mem. 2–3.)  Defendant does not dispute that he projected "return[s] in excess of 100%" to his clients, even though Lumine Fund had already incurred losses of over 50% or that he continued to project 3%–5% returns to investors, even though, at the time he made the projections, his trading had reduced the MOSI-IT clients' investment by between 94% and 99%.  (Pl.'s 56.1 ¶¶ 11, 21, 41, 44, 46, 47, 48.)  Defendant instead contends that he

> built his projections based on information and expectations about the market he had at the time as well as [] [D]efendant's expectation of the future direction of the instruments that he was trading at the time. [] [D]efendant is a contrarian, and so he was expecting a down-turn in the market as the market had significantly moved upwards. . . .  [D]efendant's market expectations were in line with those of major, reputable contrarian traders, hedge fund managers and analysts in the industry.

(Def.'s Mem. 3.)  Defendant explains that his projections started at one hundred percent given the expected initial capital of $1 million which was dramatically reduced to a 3%–5% projected return to "take the losses into account especially given only $270,000 was raised and deployed as capital," and that the "losses were inherent in the circa 97% reduction in the projected return." (*Id*.)  Defendant also notes that "Nwanze confirmed during his deposition that [Defendant] shared [his] projections and the basis of those projections with [Nwanze]."  (*Id*. at 3–4.)  In support, Defendant cites to the Nwanze deposition where Nwanze, in response to questioning regarding whether Defendant shared a basis of his April 16, 2017 projections, responded that Defendant

23

provided figures for the "total capital investments and the investment returns and the percentages based on the markets and based on the level of capital contributions," and that Defendant "would have explained to us that that was how the market was running or going at that time." (Second Bentsen Decl. Ex. 4, at 37:16–38:6.) Defendant additionally points out that he "achieved verified trading returns in 2015 of about 250% despite [] [D]efendant having significant drawdowns during that year," indicating that "recovering from significant drawdowns is possible" and that there are "numerous examples of other traders achieving outstanding returns, against all odds." (Def.'s Mem. 3–4.)

"[S]tatements of fact are actionable if they are materially misleading." *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 583 (S.D.N.Y. 2016). "The test for whether a statement is materially misleading under Section 10(b) is not whether the statement is misleading in and of itself, but whether the defendants' representations, *taken together and in context*, would have misled a reasonable investor." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) (citation and quotation marks omitted) (emphasis in original). Statements of opinions are actionable "if either 'the speaker did not hold the belief []he professed' or 'the supporting facts []he supplied were untrue.'" *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 185–86 (2015); *see also Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013) ("Subjective statements can be actionable only if the 'defendant's opinions were both false and not honestly believed when they were made.'" (quoting *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011))). Opinions are also actionable when, "though sincerely held and otherwise true as a matter of fact, . . . the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Tongue*, 816 F.3d at 210 (citation omitted).

With respect to this second basis, "[t]he core inquiry is whether the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'" *Id.* (citation omitted). This is so because "a reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view" and "if the real facts are otherwise, but not provided, the opinion statement will mislead its audience." *Omnicare*, 575 U.S. at 188.

Here, Defendant consistently offered positive projections while failing to disclose the serious losses he consistently incurred.  (Pl.'s 56.1 ¶¶ 21, 24, 43, 52–53.)  Such projections, for instance projecting MOSI-IT would achieve 5% returns after Defendant lost 99% of the MOSI-IT investments, would clearly mislead a reasonable investor.  *See SEC v. Tecumseh Holdings Corp.*, 765 F. Supp. 2d 340, 352 (S.D.N.Y. 2011) (holding "profit projections were materially false," because "halfway into fiscal year 2002, when Tecumseh was on track to record a net loss of $852,657, it was still circulating a profit projection of almost $8.3 million" and the loss was not disclosed to investors); *see also Setzer v. Omega Healthcare Invs., Inc.,* 968 F.3d 204, 213–14 (2d Cir. 2020) (holding that failure to disclose taking of loans created a "false impression of the financial health of one of [the company's] largest assets"); *SEC v. Merch. Cap., LLC*, 483 F.3d 747, 768 (11th Cir. 2007) ("It is well established that a materially misleading omission of past performance occurs when a promoter makes optimistic statements about the prospects of the business but fails to include past performance information that would be useful to a reasonable investor in assessing those statements.").  The Defendant's May Performance Statement was another clear misrepresentation, as Defendant has admitted the statement was false.  (Pl.'s 56.1 ¶¶ 54–56.)  *See also SEC v. Haligiannis*, 470 F. Supp. 2d 373, 381 (S.D.N.Y. 2007) (holding there was "ample undisputed evidence to support a finding of liability for violations of Sections

10(b) and 17(a)" when "statements made in marketing materials and newsletters falsely inflated the fund's assets and grossly exaggerated the fund's performance" and "statements sent to investors falsely inflated their returns").

Defendant's assertion that he may have, at some point, told Nwanze about the 99% loss does not suffice to create a material issue of fact. *Cf.. LaFever v. Clarke*, 525 F. Supp. 3d 305, 339 (N.D.N.Y. 2021) ("[E]ven viewing the additional facts offered by plaintiff in the light most favorable to her, they are too sparse and generalized to create a jury question on any of her claims."); *183 Bronx Deli Grocery Corp. v. United States*, No. 11-CV-1527, 2012 WL 2359664, at *3 (S.D.N.Y. June 18, 2012) ("The non-movant cannot avoid summary judgment simply by asserting a metaphysical doubt as to the material facts, and may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." (citations and quotation marks omitted)).  Indeed, "a nonmoving party's self-serving statement, without direct or circumstantial evidence to support the charge, is insufficient to defeat a motion for summary judgment." *Walker v. Carter*, 210 F. Supp. 3d 487, 503 (S.D.N.Y. 2016).  Furthermore, even taking Defendant's assertion as true, that he, at some unknown time, told Nwanze about the 99% loss, Defendant does not assert he made this disclosure at any time relevant to this case.

Additionally, Defendant's argument that "Nwanze and other participants knew that [D]efendant was engaging in high-risk speculative trades and encouraged it," pointing to the IMA between ECA Capital and Nwanze, is unavailing.  (Def.'s Mem. 4; Def.'s Mem Ex. 13.) "A generic warning of a risk will not suffice when undisclosed facts . . . would substantially affect a reasonable investor's calculations of probability."  *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014); *see also Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004)

26

("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.")).

### iii.  Material

"Misstatements or omissions are material if there is a 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'"  *SEC v. Aly*, No. 16-CV-3853, 2018 WL 1581986, at *20 (S.D.N.Y. March 27, 2018) (quotation marks omitted) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)).  "Material facts include those that affect the probable future of the company and [that] may affect the desire of investors to buy, sell, or hold the company's securities." *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 180 (2d Cir. 2001) (citation and quotation marks omitted) (alteration in original).  "When contingent or speculative events are at issue, the materiality of those events depends on 'a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.'"  *Id*. (citing *Basic,* 485 U.S. at 238).

Nwanze testified that he invested in Special Project based on Defendant's misrepresentations of and omissions regarding MOSI-IT's performance and would not have invested funds had Defendant told the truth about MOSI-IT's losses.  (Pl.'s 56.1 ¶ 77).[4]

---

[4] Defendant appears to contend that Nwanze was aware that MOSI-IT was not performing well.  (Def.'s Mem. 7.)  In particular, Defendant states in his Opposition that "[w]e embarked on the Special Project because the initial MOSI-IT project was not going well, and we were looking for ways to shore up the program.  If the MOSI-IT program were going well, we would have made transfers to the International Grail Movement (Mountain) as agreed upon at the start of the program.  There were no transfers/donations to the Mountain because [] Nwanze knew that the program was not going well."  (*Id*.)  However, Defendant has not presented evidence indicating that Nwanze was aware of any losses the MOSI-IT funds had suffered before 2019.

Additionally, the Married Couple who Defendant described as "risk averse" invested in MOSI-IT after Defendant "projected MOSI-IT to achieve 5% returns." (*Id*. ¶ 53; Bentsen Decl. Ex. 21.) Indeed, there is no question that rates of return and significant losses are material to investors. *Valicenti Advisory Servs., Inc. v. SEC*, 198 F.3d 62, 66 (2d Cir. 1999) (finding that a misstatement of an investment's rate of return is material to investors); *Tecumseh Holdings Corp.*, 765 F. Supp. 2d at 352 ("[T]here is no question that a reasonable shareholder would have considered it important, when determining whether to invest in the Class C offering in 2002, that Tecumseh was on track to record a net *loss* for the 2002 fiscal year." (emphasis in original)); *U.S. Commodity Futures Trading Comm'n v. Rolando*, 589 F. Supp. 2d 159, 170 (D. Conn. 2008) ("[A] reasonable investor would want to know that his account statements were false . . . .").

### b.  Scheme Liability

"Section 17(a)(1) and (3) of the Securities Act and Section 10(b) of the . . . Exchange Act and Rules 10b-5(a) and (c) thereunder create what courts have called 'scheme liability' for those who, with scienter, engage in deceitful conduct." *SEC v. Wey*, 246 F. Supp. 3d 894, 915–16 (S.D.N.Y. 2017) (citations and quotation marks omitted).  To establish a violation of these provisions, the SEC must show that a defendant "(1) committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter." *SEC v. Sason*, 433 F. Supp. 3d 496, 508–09 (S.D.N.Y. 2020) (citation and quotation marks omitted).  A deceptive or manipulative act is "some act that gives the victim a false impression." *United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008).  To establish liability, a defendant "must have participated in an illegitimate, sham[,] or inherently deceptive transaction where [his/her] conduct or role ha[d] the purpose and effect of creating a false appearance." *SEC v. CKB168*

*Holdings, Ltd.*, 210 F. Supp. 3d 421, 445 (E.D.N.Y. 2016) (third alteration in original) (citation and quotation marks omitted).

Courts "have repeatedly allowed both 'scheme liability' and deceptive statement claims to go forward 'where the plaintiffs allege both that the defendants made misrepresentations in violations of Rule 10b–5(b), as well as that the defendants undertook a deceptive scheme or course of conduct *that went beyond the misrepresentations.*'" *SEC v. Cole*, No. 12-CV-8167, 2015 WL 5737275, at *8 (S.D.N.Y. Sept. 19, 2015) (emphasis in original) (citations omitted). Recently, in *Lorenzo v. Securities and Exchange Commission*, 139 S. Ct. 1094 (2019), "the Supreme Court expanded the scope of scheme liability claims under the securities laws." *SEC v. Sugarman*, No. 19-CV-5998, 2020 WL 5819848, at *7 n.8 (S.D.N.Y. Sept. 30, 2020). Specifically, the Supreme Court held that the "dissemination of false or misleading statements with intent to defraud can fall within the scope of subsections (a) and (c) of Rule 10b-5, . . . even if the disseminator did not 'make' the statements and consequently falls outside subsection (b) of the Rule." *Lorenzo*, 139 S. Ct. at 1100–01. In that case, Francis Lorenzo, a director of investment banking at an SEC-registered brokerage firm, sent emails (at the behest of his boss) to prospective investors that described a potential investment in a company. *Id*. at 1099. The description contained false statements about the assets of the company which Lorenzo knew were inaccurate. *Id*. at 1100. After reviewing the dictionary definitions of the terms "device," "scheme," "artifice," "act," and "practice," the Supreme Court concluded that subsections (a) and (c) encompass "a *wide range of conduct*" including the act of "disseminating false or misleading information to prospective investors with the intent to defraud." *Id.* at 1101 (emphasis added). The Supreme Court reasoned that "[b]y sending emails he understood to contain material untruths, Lorenzo 'employ[ed]' a 'device,' 'scheme,' and 'artifice to defraud' within the

meaning of subsection (a) of the Rule, § 10(b) . . . [and b]y the same conduct, he 'engage[d] in a[n] act, practice, or course of business' that 'operate[d] ... as a fraud or deceit' under subsection (c) of the Rule." *Id.*

In reaching its decision, the Supreme Court rejected the view that only subsection (b) of Rule 10b–5 regulates conduct involving false or misleading statements and noted that there is "considerable overlap among the subsections of the Rule." *Id*. at 1102. The Court rejected the notion "that each of these provisions should be read as governing different, mutually exclusive, spheres of conduct," observing that the "[Supreme] Court and the Commission have long recognized considerable overlap among the subsections of the Rule and related provisions of the securities laws." *Id.*

Accordingly, "misstatements and omissions can form *part* of a scheme liability claim, but an actionable scheme liability claim also requires something *beyond* misstatements and omissions, such as dissemination." *SEC v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022) (emphasis in original). Here, the SEC argues that scheme liability exists because Defendant disseminated false and misleading information. (Def.'s Mem. 16.) Indeed, the SEC has adduced uncontroverted evidence that Defendant disseminated false and misleading information to Nwanze, Okonji, and the Married Couple. (Pl.'s 56.1 ¶¶ 21, 24, 43, 52–54; Bentson Dec. Ex. 8.) In the wake of *Lorenzo*, Defendant can be held liable for scheme liability for directly disseminating statements to Nwanze, Okonji, and the Married Couple so long as he possessed the requisite scienter. *Lorenzo*, 139 S. Ct. at 1104 (holding defendant who directly transmitted false statements to prospective investors could be held liable under scheme liability); *Rio Tinto plc*, 41 F.4th at 53 ("*Lorenzo* rejected the view that only subsection (b) of Rule 10b-5 can regulate conduct involving false or misleading statements.").

c.  Scienter

Scienter is a mental state "embracing intent to deceive, manipulate, or defraud." *SEC v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486, 511 (S.D.N.Y. 2018) (citation omitted).  Scienter also "may be established through a showing of reckless disregard for the truth, that is, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care."  *SEC v. McNulty*, 137 F.3d 732, 741 (2d Cir. 1998) (quotation marks and citations omitted).  At the summary judgment stage, the SEC "must produce evidence (1) showing that the defendant[] had motive and opportunity to commit fraud, or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Yorkville Advisors, LLC*, 305 F. Supp. 3d at 511 (citation and quotation marks omitted).  Under the latter theory, the SEC must show conduct that is "highly unreasonable" and "represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendants or so obvious that the defendant must have been aware of it." *Id*.  Accordingly, to prevail on this Motion, the SEC "must provide admissible evidence that [D]efendant[] [was] aware of facts or had access to (i) information contradicting [his] statements, or (ii) facts demonstrating that [D]efendant[] failed to review or check information that [he] had a duty to monitor." *SEC v. Gallison*, 588 F. Supp. 3d 509, 523 (S.D.N.Y. 2022) (citation omitted).

At the times Defendant made his false statements and omitted facts regarding actual performance, both the projections and historical statements of investment performance, Defendant had access to correct information about how the investments were performing.  (Pl.'s 56.1 ¶ 36.)  Indeed, Defendant approved statements from the fund administrator that necessarily made him aware of his substantial trading losses.  (*Id*. ¶¶ 38, 39, 44, 47, 51, 60.)  And Defendant testified that he was aware that excluding new investor funds, Lumine Fund "probably" never

had a net positive return from inception.  (Second Bentsen Decl. Ex. 2, at 200:5–7.)  Defendant

additionally testified that in March 2017, he was aware that the Fund "was down substantially"

and more specifically, was down negative 81.04%.  (*Id*. at 198:23–199:12.)  Accordingly, the

SEC has established that Defendant, at the very least, acted with reckless disregard for the truth.

*See SEC v. Constantin*, 939 F. Supp. 2d 288, 308 (S.D.N.Y. 2013) ("Representing information as

true while knowing it is not . . . [is] sufficient to support a conclusion of scienter."); *Tecumseh*

*Holdings Corp.,* 765 F. Supp. 2d at 357 (holding the SEC was entitled to summary judgment

when defendant "wrote the offering documents and authorized their distribution" and admitted

the company recorded only operating losses, because he therefore "knew or was reckless in not

knowing that the [] income projections given to investors were baseless"); *see also SEC v.*

*StratoComm Corp.,* 652 F. App'x 35, 38 (2d Cir. 2016) (affirming summary judgment on scienter

because the "record demonstrates that [defendants] knew the statements at issue to be false when

made").

### d.  Purchase or Sale of Securities

Rule 10b-5 applies to frauds made "in connection with the purchase or sale of securities."

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 84 (2006) (citation omitted).

This requirement is broad, and "it is enough that the fraud alleged 'coincide' with a securities

transaction."  *Id*.  The Exchange Act, however, "must not be construed so broadly as to convert

every common-law fraud that happens to involve securities into a violation of § 10(b)."  *SEC v.*

*Zandford*, 535 U.S. 813, 820 (2002) (citations omitted).  "Any statement that is reasonably

calculated to influence the average investor satisfies the 'in connection with' requirement of Rule

10b-5."  *SEC v. Simeo*, No. 19-CV-8621, 2021 WL 4041562, at *10 (S.D.N.Y. Sept. 3, 2021)

(citation and quotation marks omitted).  "Section 17(a)'s requirement that the misconduct occur

in the 'offer' or 'sale' of securities is similarly expansive." *SEC v. Ahmed*, 308 F. Supp. 3d 628, 658 (D. Conn. 2018) (citing *Cole*, 2015 WL 5737275, at *7 ("In addressing Section 17(a)'s requirements that fraud occur 'in' the 'offer' or 'sale' of securities, the Supreme Court has explained that 'Congress expressly intended to define [these statutory terms] broadly' and that these terms 'are expansive enough to encompass the entire selling process.'" (quoting *United States v. Naftalin*, 441 U.S. 768, 773 (1979)))).

　　"An 'investment contract,' which the Securities Act and Exchange Act include in the definition of a 'security,' is an investment of money in a common enterprise, with a reasonable expectation of profits to be derived from the efforts of others." *SEC v. Spark Trading Grp., LLC*, No. 18-CV-1498, 2018 WL 6727349, at *2 (E.D.N.Y. Dec. 21, 2018) (citing *SEC v. W.J. Howey*, 328 U.S. 293 (1946)); *see also CKB168 Holdings, Ltd.*, 210 F. Supp. 3d at 450 (noting that under the *Howey* test, "developed by the Supreme Court, a transaction is an 'investment contract' [subject to regulation by the securities laws] if persons invest or loan money to a common enterprise with a promise or expectation of profits to come solely from the efforts of others (generally the promoter or a third party)." (alteration in original) (citation omitted)).  There is no factual dispute that the interests in the two investment vehicles at issue, MOSI-IT and Special Project, were securities, as investor assets in MOSI-IT and Special Project were pooled, invested together, and any profits would be derived exclusively from Defendant's efforts.  *See Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994) (noting that a security can be established by "the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets" combined with the pro-rata distribution of profits); *CKB168 Holdings, Ltd.*, 210 F. Supp. 3d at 450–51 (holding that "the *Howey* test is met because new investors purchased business packs to join CKB, a common enterprise, expecting to receive 'passive' returns and

stock that would appreciate in value as a result of CKB's legitimate corporate efforts").

Defendant made multiple positive projections regarding returns while omitting information

regarding the poor performance of the Fund in offering documents, updates, and meetings with

prospective investors.  (Pl.'s 56.1 ¶¶ 21, 24, 43, 52–53.)  Defendant additionally issued a false

statement immediately preceding an investment by Nwanze.  (*Id*. ¶ 76.)  Given the broad

construction afforded to this provision, this Court holds that Defendant's statements were "in

connection with" the purchase or sale of securities because they could have influenced "the

average investor" to make these purchases.  *See Simeo,* 2021 WL 4041562, at *10 (holding that

the material misrepresentations and omissions were "in connection with" the purchase or sale of

securities because they could have influenced "the average investor" to make these purchases

when SEC filings that contained the material misrepresentations and omissions were filed during

the same period that $2 million worth of securities were sold through private placements);

*CKB168 Holdings, Ltd*., 210 F. Supp. 3d at 450 ("The SEC has met its burden here as the

undisputed record shows that defendants' actions and statements were made for the sole purpose

of influencing investors to invest in CKB."); *Tecumseh Holdings Corp*., 765 F. Supp. 2d at 357

("The materially false and misleading misrepresentations and omissions concerning the profit

projections, . . . were [] made 'in' and 'in connection with' the offer, purchase, or sale of

securities because they were all included in the offering memoranda (drafted by Milling) for the

Tecumseh securities, which were distributed to investors in order to persuade them to purchase

the securities of Tecumseh.").

### e.  Means and Instrumentalities of Interstate Commerce

The SEC also argues that there is no dispute of material fact that the jurisdictional

element of interstate commerce has been satisfied.  (Pl.'s Mem. 20–21.)  In this action, the SEC

asserts that Defendant violated the second subsection—Rule 10b-5(b)—which makes it unlawful "directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, . . . [t]o make any untrue statement of a material fact." Rule 10b–5(b), 17 C.F.R. § 240.10b–5(b). "Inherently interstate methods of communication, such as the Internet or e-mail, constitute 'instrumentalities' of interstate commerce." *SEC v. Norstra Energy Inc.*, 202 F. Supp. 3d 391, 398–99 (S.D.N.Y. 2016). There is no dispute of material fact that many misstatements were transmitted by e-mail over the Internet. For instance, on April 16, 2017, in response to an inquiry from Nwanze, Defendant wrote that he alluded to a "mere 3% to 3.5% annual return" because "the way the investment has been structured" prevented him from providing "the actual return" but that 3% to 3.5% were what his "current projections indicate" without disclosing the substantial losses already incurred. (Pl.'s 56.1 ¶ 43.) And on June 26, 2018, Defendant emailed a file to Nwanze and Okonji that purported to be "the MOSI-IT performance report from inception to May 21, 2018," which Defendant admitted was false. (*Id*. ¶¶ 54, 58.) Accordingly, the SEC's motion for partial summary judgment on Rule 10b–5(b)'s jurisdictional element is granted. *Norstra Energy Inc.,* 202 F. Supp. 3d at 399 (granting summary judgment for the SEC when evidence demonstrated that "misstatements were transmitted by mail, e-mail, and over the Internet"); *Constantin,* 939 F. Supp. 2d 288, 305 (S.D.N.Y. 2013) (holding defendants' use of email "in connection with the sale of securities is sufficient to bring their conduct within the jurisdictional scope of the federal securities laws").

### f.  Obtain Money or Property

While the elements of a Rule 10b-5(b) and Section 17(a)(2) claim are essentially the same, *SEC v. Genovese*, 553 F. Supp. 3d 24, 40–41 (S.D.N.Y. 2021), Section 17(a)(2)

specifically requires that a defendant "obtain money or property" by means of a material misrepresentation or omission, *SEC v. Hurgin*, No. 19-CV-5705, 2022 WL 4448561, at *8 (S.D.N.Y. Sept. 23, 2022).  The SEC argues that "although it was ECA Capital that received the investor money for [Defendant's] other materially misleading statements and omissions . . . [Defendant] obtained [] Nwanze's and [] Okonji's Special Project investments directly into his personal bank and brokerage accounts, thereby meeting the 'obtain[ing] money or property' element of Section 17(a)(2)."  (Pl.'s Mem. 15.)  While there is a "split of authority in this District as to whether a defendant must have personally gained money or property, or whether it is sufficient to have obtained money or property on behalf of an employer*," SEC v. MiMedx Grp., Inc.,* No. 19-CV-10927, 2022 WL 902784, at *10–11 (S.D.N.Y. Mar. 28, 2022), there is no dispute that when a "defendant personally gains money or property from the fraud," Section 17(a)(2) is satisfied,  *SEC v. Syron*, 934 F. Supp. 2d 609, 640 (S.D.N.Y. 2013).  Accordingly, this Court agrees with the SEC that when Defendant received Special Project investments directly into his personal bank and brokerage accounts, he obtained money or property by means of a material misrepresentation or omission.  *See Syron*, 934 F. Supp. 2d at 638 ("[T]o obtain an object is to gain possession of it.").

### 2.  Advisers Act

Section 206 of the Advisers Act prohibits, in relevant part, "any investment adviser" from "directly or indirectly" (1) "employ[ing] any device, scheme, or artifice to defraud any client or prospective client" or (2) "engag[ing] in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client."  15 U.S.C. § 80b-6.  Section 206 of the Advisers Act "prohibits failures to disclose material information, not just affirmative frauds."  *Genovese*, 553 F. Supp. 3d at 41 (citation and quotation marks omitted).  "Courts have

recognized that facts supporting a Securities Act Section 17(a) or an Exchange Act Section 10(b) violation by an investment adviser will also support a showing of a Section 206 violation under the Advisers Act." *Id.* at 41 (citation and quotation marks omitted).  As the SEC has established that Defendant violated Securities Act Sections 17(a) and Exchange Act 10(b), the only remaining issue under the Advisers Act claim is whether Defendant is an "investment adviser" under the Advisers Act.

Section 202(a)(11) defines an investment advisor as "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities." 15 U.S.C. § 80b-2(a)(11).

The Parties dispute whether Defendant engaged in the business of advising others *for compensation*. First, the SEC argues that Defendant "was entitled to compensation for his work advising the MOSI-IT clients," because "he entered into an advisory relationship with each of the MOSI-IT clients by signing the ECA Capital Management LLC Investment Management Agreement" which described how first year profits "net of management and performance fees" would be distributed.  (Pl.'s Reply Mem. 7.)   Relying on *SEC v. Fife*, 311 F.3d 1 (1st Cir. 2002), the SEC argues that Defendant was entitled to compensation for his work advising the MOSI-IT clients given the Investment Management Agreement, and that the "expectation of compensation satisfies the compensation element of the investment adviser definition."  (*Id.*) *See Fife,* 311 F.3d at 10–11 (noting that while defendant had "not yet received compensation, he understood that he would be compensated for his efforts by a commission based on a percentage of the profits from

the investments, *if successful,* pursuant to a formula to be agreed upon at a later time" which was sufficient to meet definition of investment adviser (emphasis in original)).

Defendant argues that he was not an investment adviser to his MOSI-IT advisory clients because he did not receive compensation from them in exchange for the advisory services he provided, as he provided his services "as part of his volunteer activities for the Grail Movement." (Def.'s Mem. 1–2.)  He points to an email he sent to Nwanze and Okonji regarding MOSI-IT where he listed "[o]ther costs" as third-party fund administrative fees, and additionally listed costs of annual audits and tax accountants—arguing that "[i]t did not refer to any compensation for [] [D]efendant."  (Def.'s Mem. 1; Def.'s Mem Ex. 1.)  He further argues that it "was only coincidental that the MOSI-IT project was traded through Lumine Fund" and that the "participants did not sign Lumine Fund investor materials because they had no agreement with Lumine Fund," instead "their agreement was with ECA Capital."  (Def.'s Mem. 3.)  Defendant also points to the fact that he "used his own resources" to pay the fund's expenses.  (*Id.*; Def.'s Mem. Ex. 7.)

The Investment Management Agreement signed by Nwanze with ECA Capital on December 12, 2016 defined net profits as "after management and performance fees."  (Bentsen Decl. Ex. 10.)  The Q&A document Nwanze emailed Grail Movement members stated that "fees and administrative costs" would be deducted from profits, but did not quantify the fees or costs. (Bentsen Decl. Ex. 9.)  Unlike the Lumine Fund offering documents which specifically stated that ECA Capital Management would receive a monthly management fee of 1% or 2% (annualized) of the account balance and a quarterly performance fee of 40% of net capital appreciation, Defendant's agreement with Nwanze does not define the management or performance fee.  (Pl.'s 56.1 ¶ 7; Bentsen Decl. Ex. 10.)

Furthermore, in an email from Defendant on January 31, 2017, when asked "what are the fee charges" pertaining to the $225,000 and $50,000 that were transferred to the Fund from ECA Capital between October 26, 2016 and October 28, 2016, Defendant responded "no fees." (Bentsen Decl. Ex. 11.)  As the SEC has asserted that Defendant began trading with $270,000 of MOSI-IT investor funds in November 2016, almost immediately after the referenced transfer, (*see* Pl.'s 56.1 ¶ 27), it is probable the $275,000 Defendant referred to in his email that would not be subject to fees constituted the MOSI-IT investment.  Accordingly, this email supports Defendant's assertion that, despite the Investment Management Agreement's reference to management and performance fees, Defendant was not advising his MOSI-IT clients for compensation.  Nwanze also testified that Defendant "told us that [he] will not charge any fees." (Second Bentsen Decl. Ex. 4, at 62:8–9.)  And while an email from Fleming Financial Services indicates that there was at least one investor in the Lumine Fund who "paid full fees during March 2017," (*see* Bentsen Decl. Ex. 17), and the Parties appear to agree that by that time, the "only money in this account was MOSI-IT investor money," it is unclear whether "full fees" in this context includes compensation to Defendant.  (Bentsen Decl. Ex. 4, at 222:22–23:3.) Accordingly, the SEC has not demonstrated that Defendant had an expectation of compensation from his MOSI-IT clients.

Second, the SEC argues that because Lumine Fund had compensation fees and MOSI-IT clients' funds were deposited in Lumine Fund, Defendant was entitled to compensation for advising his MOSI-IT clients because the "possibility of these fees if [Defendant's] trading had been profitable—whether directly via the Agreement he and the MOSI-IT clients signed or by virtue of their funds being deposited in Lumine Fund—qualifies as compensation and clearly establishes that [Defendant] was an Investment Adviser."  (Pl.'s Reply Mem. 8.)  However,

while funds from different clients including MOSI-IT clients were deposited in the Lumine

Fund, Defendant did at times distinguish between fees that different clients paid.  As discussed,

Defendant explicitly stated that the $275,000 transferred in October 2016 would not be charged

fees.  (Bentsen Decl. Ex. 11.)  Similarly, there are repeated references to a client who "paid full

fees" in the emails referencing the Lumine Fund returns, indicating that not all clients "paid full

fees."  (Bentsen Decl. Exs. 15, 17.)  Accordingly, it is not clear that just because MOSI-IT

clients' funds were deposited in Lumine Fund that Defendant expected to be compensated for his

work advising MOSI-IT clients.

Finally, the SEC argues that "even if [Defendant] was not entitled to compensation for

advising his MOSI-IT clients, [Defendant] concedes that he 'served as [Lumine Fund's]

investment adviser.'"  (Pl.'s Reply Mem. 8.)  Defendant does state that he "established Lumine

Fund and [s]erved as its Investment Adviser."  (Def.'s Mem 1.)  Plaintiff cites to Investment

Advisers Act Release No. 3222, 76 Fed. Reg. 39646, 39669 (July 6, 2011), which notes that

"[a]lthough a person is not an 'investment adviser' for purposes of the Advisers Act unless it

receives compensation for providing advice to others, once a person meets that definition (by

receiving compensation from any client to which it provides advice), the person is an adviser and

the Advisers Act applies to the relationship between the adviser and any of its clients (whether or

not the adviser receives compensation from them)."  (Pl.'s Reply Mem. 8.)  Accordingly, the

SEC contends that "[g]iven that [Defendant] was entitled to receive performance and

management fees for his Lumine Fund services (and thus meets the compensation element of an

investment adviser to the Lumine Fund), [Defendant] necessarily also meets the definition of an

investment advisor for his MOSI-IT clients."  (*Id.*)

The Court notes that the record is unclear as to whether Defendant ever actually received fees for his work advising non-MOSI-IT Lumine clients—indeed, the SEC has not argued that Defendant received compensation for that work but rather that he was "entitled to receive performance and management fees." (*Id.*) Defendant testified that he received management fees "maybe once or twice" but also testified that he "actually did not get any benefit from management fees or performance allocation." (Second Bentsen Decl. Ex. 1, at 62:16–20.) Additionally, on January 31, 2017, in his email communications with Fleming Financial Services, Defendant explained that "Triple Thrust has a 1% management fee because the subscription documents I sent had an incorrect fee of 1% which I had to honor," detailed the management and performance fees other clients would pay in relation to 2016 Lumine statements, and sought to understand how the management fees were generally calculated, however later in that same email chain, on February 10, 2017, Defendant requested that "the management fees charged to investors in 2016 be reversed." (*Id*. at 171:13–172:15; Bentsen Decl. Ex. 11.)

However, even if Defendant never actually *received* fees from his non-MOSI-IT clients, there was an *expectation* of compensation from his non-MOSI-IT clients. The Lumine Fund offering documents clearly laid out a compensation plan. (Pl.'s 56.1 ¶ 7; Bentsen Decl. Ex. 10.) That Defendant was entitled to collect compensation fees from his non-MOSI-IT clients is clear—his January and February 2017 emails with Fleming Financial Services confirm that Defendant was entitled to management and performance fees, as Defendant spelled out the fees he was entitled to from individual investors and an investment group. (Bentsen Decl. Ex. 11.) That Defendant had the discretion to waive these fees by requesting that "the management fees charged to investors in 2016 be reversed" does not indicate he was not entitled to compensation.

41

(*Id*. at 171:13–72:15; Bentsen Decl. 11.)  Furthermore, Defendant sent an email to the fund administrator or representative of the fund administrator on April 11, 2017, stating "I would like management fees and performance fees, when applicable in the future, to be applied to ECA Capital when preparing its investor statements," indicating an acknowledgment that even though Defendant had been waiving fees, there was an expectation of management fees and performance fees from his clients.  (Second Bentsen Decl. Ex. 1, at 174:20–75:10.)[5]  As such, there is no genuine issue of material fact that, at the least, Defendant was entitled to receive performance and management fees for his Lumine Fund services to non-MOSI-IT clients and was therefore an investment advisor—indeed Defendant has admitted he served as Lumine Fund's investment advisor.  *See Fife*, 311 F.3d at 10–11 (holding that a defendant was an investment advisor despite lack of compensation when it was understood he would be compensated based on a percentage of profits if successful); Advisers Act Release No. 3222, 76 Fed. Reg. 39646, 39669 (July 6, 2011) ("Although a person is not an 'investment adviser' for purposes of the Advisers Act unless it receives compensation for providing advice to others, once a person meets that definition (by receiving compensation from any client to which it provides advice), the person is an adviser and the Advisers Act applies to the relationship between the adviser and any of its clients (whether or not the adviser receives compensation from them).").[6]

---

[5] Defendant testified that "in the future" referred to "when the MOSI-IT investments are done" and "no longer involved in the general partnership."  (Second Bentsen Decl. Ex. 1, at 174:20–75:20.)

[6] To the extent the SEC seeks to hold Defendant liable on an alternative theory of aiding and abetting, as the Court has granted the SEC's Motion for Summary Judgement on its claims of direct liability, it need not reach the issue of aiding and abetting liability.

III.  Conclusion

For the foregoing reasons, Plaintiff's Motion is granted.  The Clerk of the Court is

respectfully requested to terminate the pending Motions at Dkt. Nos. 42, 54.  The SEC is to

submit a letter one week after this Opinion is issued describing what next steps, if any, they

intend to take.  Defendant shall have two weeks to respond to the SEC's letter.

SO ORDERED.

Dated:    September 28, 2023
            White Plains, New York

_____
KENNETH M. KARAS
United States District Judge